**Diana RAHN, Plaintiff,**

v.

**JUNCTION CITY FOUNDRY, INC., Defendant.**

**No. CIV. A. 00–2128–KHV.**

United States District Court, D. Kansas.

July 20, 2001.

1220

Walter P. Robertson, Junction City, KS, Martin M. Meyers, Stephen C. Thornberry, The Meyers Law Firm, LC, Kansas City, MO, for plaintiff.

Joseph M. Backer, Boggs, Backer & Bates, LLC, Kansas City, MO, William S. Robbins, Jr., Watkins, Boulware, Lucas, Miner, Murphy & Taylor, LLP, Kansas City, MO, for defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Diana Rahn filed suit against her former employer, Junction City Foundry, Inc. Plaintiff alleged that defendant subjected her to a hostile work environment and constructively discharged her in retaliation for complaining about its discriminatory conduct, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. as amended. On March 16, 2001, a jury found defendant liable on both claims. On the hostile work environment claim the jury awarded plaintiff $1,000 in actual damages and $30,000 in punitive damages. On the retaliation claim the jury awarded plaintiff $16,000 in compensatory damages, $2,030 in back pay, and $100,000 in punitive damages. This matter is before the Court on Defendant's Motion For Judgment As A Matter Of Law At The Close Of Plaintiff's Evidence (Doc. # 98) filed March 14, 2001 and Defendant's Motion For Judgment As A Matter of Law At The Close Of All The Evidence (Doc. # 102) filed March 16, 2001, both of which the Court took under advisement at the time they were filed. The matter is also before the Court on Defendant's Renewed Motion For Judgment As A Matter of Law Or, In

The Alternative, Motion For New Trial Or Remittitur (Doc. # 111) filed March 30, 2001, Plaintiff's Motion For Attorneys Fees Pursuant To 42 U.S.C. § 2000e–5 (Doc. # 108) filed March 29, 2001, and Defendant's Motion For Leave to File Surreply To Plaintiff's Reply Suggestions In Support Of Motion For Attorney's Fees (Doc. # 125) filed June 29, 2001. For reasons set forth below, the Court finds that defendant's motions should be overruled, except that in light of the Court's ruling, defendant should be given the opportunity to fully respond to plaintiff's motion for attorneys fees.

### Judgment As A Matter Of Law Standards

 Judgment as a matter of law "should be cautiously and sparingly granted." Rule 50(b), Fed.R.Civ.P.; *Zuchel v. City & County of Denver*, 997 F.2d 730, 734 (10th Cir.1993). Judgment as a matter of law is appropriate "only if the evidence, viewed in the light most favorable to the nonmoving party, points but one way and is susceptible to no reasonable inferences supporting the nonmoving party." *Riggs v. Scrivner, Inc.*, 927 F.2d 1146, 1149 (10th Cir.1991). Such judgment is proper only when "the evidence so strongly supports an issue that reasonable minds could not differ." *Ryder v. City of Topeka*, 814 F.2d 1412, 1418 (10th Cir. 1987). In determining whether judgment as a matter of law is proper, the Court may not weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury. See *Lucas v. Dover Corp.*, 857 F.2d 1397, 1400 (10th Cir.1988). Nevertheless, the Court must find more than a mere scintilla of evidence favoring the nonmovant; the Court must find that "evidence was before the jury upon which it could properly find against the movant." *Cooper v. Asplundh Tree Expert Co.*, 836 F.2d 1544, 1547 (10th Cir. 1988). The Court must affirm the jury verdict if, viewing the record in the light most favorable to the nonmoving party, it contains evidence upon which the jury could properly return a verdict for the nonmoving party. See *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1546 (10th Cir.1996). The Court must enter judgment as a matter of law in favor of the moving party, however, if "there is no legally sufficient evidentiary basis ... with respect to a claim or defense ... under the controlling law." *Id.* at 1546–47 (quoting Fed.R.Civ.P. 50(a)). A legally sufficient basis requires more than a "scintilla of evidence" favoring the nonmoving party. *Cooper*, 836 F.2d at 1547.

### New Trial Standards

 The decision to grant a motion for new trial is committed to the trial court's sound discretion. See *Unit Drilling Co. v. Enron Oil & Gas Co.*, 108 F.3d 1186, 1194 (10th Cir.1997). In considering a motion for new trial, the Court must view the evidence in the light most favorable to the prevailing party. See *Joyce v. Davis*, 539 F.2d 1262 (10th Cir.1976). "The verdict must demonstrate trial errors which constitute prejudicial error or that the verdict is not based on substantial evidence." *White v. Conoco, Inc.*, 710 F.2d 1442, 1443 (10th Cir.1983). The Court should "exercise judgment in preference to the automatic reversal for 'error' and ignore errors that do not affect the essential fairness of the trial." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984) (quotations and citations omitted).

### Jury Instruction Standards

 The decision whether to give a particular jury instruction is within the sound discretion of the Court. The instructions as a whole must provide correct statements of the governing law and pro-

vide the jury with an ample understanding of the issues and applicable legal standards. See *Allen v. Minnstar*, 97 F.3d 1365, 1368 (10th Cir.1996). The question is not "whether the charge was faultless in every particular, but whether the jury was misled in any way and whether it had understanding of the issues and its duties to determine these issues." *Mason v. Okla. Turnpike Auth.*, 115 F.3d 1442, 1454 (10th Cir.1997) (quotations and citations omitted); see *Brown v. Wal–Mart Stores, Inc.*, 11 F.3d 1559, 1564 (10th Cir.1993) ("An error in jury instructions will mandate reversal of a [civil] judgment only if the error is determined to have been prejudicial after reviewing the record as a whole.").

## Factual Background

At trial the parties painted dramatically different pictures of plaintiff's conduct and that of her co-workers and supervisors. Plaintiff presented evidence that she was a conscientious employee; that co-workers targeted her with inappropriate sexual comments and vulgar conduct, that management inadequately responded to her complaints; and that after she complained, co-workers and supervisors treated her in a manner which ultimately forced her to resign. Defendant portrayed plaintiff as a vulgar woman who wore tight clothing with sexually suggestive slogans, flagrantly engaged in sexual banter in the workplace and encouraged others to do likewise, and made only token complaints. The jury heard the evidence over four days of trial, and after deliberating for several hours, adopted plaintiff's version of events. The evidence at trial must therefore be viewed in light of the jury's decision.

Defendant hired plaintiff on September 9, 1997. She initially worked in the core room with Terry Curtis as her supervisor. Curtis reported to plant manager Joe Teeter, who reported to Steve Didion, de-

fendant's president. Sandra Wheeler, defendant's personnel manager, reported directly to Didion. Defendant transferred plaintiff to the molding lines in February 1998 and ultimately assigned her the job of muller operator. In this position, plaintiff began to interact with David Knox, Dennis Dezotell and other grinders. Curtis continued to serve as her supervisor.

Plaintiff testified that beginning in March or April 1998, Dezotell and Knox made numerous sexually inappropriate comments to her. Dezotell told plaintiff something to the effect of "show me your tits and I'll show you my dick." Plaintiff told him to get away from her. On another occasion, Dezotell told plaintiff that he knew how she could make some money and took her to Knox, who asked plaintiff if he could buy her underwear for $20. This comment shocked and embarrassed plaintiff, and within a day or two she reported it to Curtis. She also reported it to Wheeler. Meanwhile, other workers repeated the comment frequently in plaintiff's presence.

Knox made many other inappropriate sexual comments to plaintiff. For example, he offered plaintiff money to watch him masturbate. This offer embarrassed plaintiff and she returned to her work station. Plaintiff repeatedly complained to Curtis about this and other comments. Sometime in late summer, Knox told co-workers that at home he had a blow-up doll named Diana (plaintiff's first name). Knox offered plaintiff money to wash his windows naked and lie in his bed naked. One day when plaintiff was absent from work, Knox told co-workers (including Gary Joseph) that he had plaintiff tied up in his basement and that he had been having sex with her. After Joseph told plaintiff about this, she complained to Curtis about it.

Knox and others in the grinding department also accused plaintiff of having sexual relations with Joseph. Knox made lewd comments to Joseph about plaintiff, e.g., asking if he could smell Joseph's penis because he knew that Joseph had had sexual relations with plaintiff.

Workers at Junction City Foundry manufactured a cast iron penis. Mike Havens, one of plaintiff's fellow employees, put it on plaintiff's fork lift and she took it back to her work station at the muller. The cast iron penis offended plaintiff and she showed it to Curtis, who said that he would take care of it. Plaintiff later told Wheeler about it.[1]

Plaintiff testified that in May or June of 1998, other workers called her to a picnic table outside the plant, where she found another cast iron penis wrapped in paper towels. She left it sitting there. Joe Clemmons, a co-worker, took the penis to plaintiff's work station. He told her that Knox had said that that was what he [Knox] looked like and that he had it made so that plaintiff would know what he looked like. Plaintiff placed the penis on a table near her work station and ignored it. Pat Oquist, a co-worker, approached plaintiff's work station. Plaintiff showed her the cast iron penis and Oquist asked how she could get one. Plaintiff told her to ask the employees who she believed were making them, including Little Joe. Plaintiff did not tell Oquist that she had reported anyone for sexual harassment on account of the cast iron penises.

Knox asked plaintiff to marry him, and he gave her metal rings which he had made in the foundry. Sometime between mid-August and December, Knox asked plaintiff if she shaved her pubic hair. Knox also slapped plaintiff on the buttocks as she walked past him. Co-workers, including Clemmons and Everett Ford, would shove Knox into plaintiff. More than once, Knox attempted to expose his penis on the workroom floor. Knox unzipped his pants, pantomimed having sex with a large metal casting, and waved at plaintiff to get her attention.[2]

Joseph testified via deposition and generally corroborated plaintiff's testimony. He testified that many of the grinders made sexual comments to plaintiff. Joseph also testified that supervisors saw the cast iron penises but took no action. Although defendant produced evidence that Joseph himself was involved in manufacturing the cast iron penises, he denied it.

Curtis, plaintiff's supervisor, testified that plaintiff complained to him on a few occasions about sexually inappropriate conduct by Knox and other grinders, including the comment about paying plaintiff money for her underwear. Curtis testified that he always passed plaintiff's complaints along to the personnel (human resources) director. Curtis also testified that even after plaintiff complained to him, she would go out to eat at the picnic table just outside the door and joke around with Joseph, Knox and other grinders. Curtis therefore thought that things were okay. Curtis also testified, however, that plaintiff clearly wanted the inappropriate sexual comments to stop.

On December 11, 1998, plaintiff again complained to Curtis about inappropriate sexual comments, in particular the fact that Knox had tried to expose himself to her. Curtis took her to speak with Fred

---

1. Wheeler testified that she could not remember plaintiff complaining to her of sexual harassment, and that she never heard anything about any cast iron penises. Wheeler testified that she recalled only one complaint about Knox, related to "cussing," and that she talked to Knox about it.

2. According to Knox, grinders occasionally pretended that they were sticking their penises in castings.

Hirsch, defendant's new personnel manager. Plaintiff testified that she told Hirsch about many of the comments that Knox had made over the previous months, including the underwear comment. Plaintiff also told him that Joseph had witnessed many of the incidents. At trial Hirsch recalled only one complaint: that Knox had basically offered plaintiff money in exchange for sex. Hirsch did not ask plaintiff for details of any incidents, however, allegedly because she had said that she just wanted it to stop and he felt that he should not force her to go into details. Hirsch testified that in conducting an investigation of harassment complaints, it would be important to write down plaintiff's statement, yet he did not do so.

Curtis testified that he sat in on the meeting between plaintiff and Hirsch, and that plaintiff told Hirsch about a number of incidents, including the comments about money for underwear, Knox's claim that he had tied plaintiff up in his basement, and the wedding rings. Curtis stated that he was embarrassed by some of the comments which plaintiff related. Curtis recalled that Hirsch took a statement from Curtis, taped recorded it, and said that he would take care of things.

Hirsch testified that shortly after the meeting on December 11, 1998, with plaintiff and Curtis, he asked Knox whether he had offered plaintiff money in exchange for anything. Knox told Hirsch that plaintiff had asked him for money in exchange for sex. Hirsch testified that he did not believe Knox's claim. During his initial investigation, however, Hirsch asked Knox about only that one comment, and he did not speak to Joseph or any other employees. At that point he considered the matter closed.[3]

Hirsch told Teeter about it and perhaps a couple of weeks later, he also told Didion. Hirsch also warned Knox that if there were further problems, he could be disciplined.

On January 7, 1999, plaintiff spoke to Hirsch again because she did not believe that he had investigated her complaints. Plaintiff told Hirsch that employees were spreading rumors that she and Joseph were having an affair and that she was pregnant with Joseph's child. Plaintiff also told Hirsch that Knox had another employee give her a small pigeon with a broken wing, and that she took it as a threat. According to plaintiff, Hirsch said that he had spoken to Knox and that he did not know who to believe. Also according to plaintiff, Hirsch told her that the company did not have a sexual harassment policy.

According to Hirsch, he told plaintiff that he was not comfortable with defendant's sexual harassment policy. He testified at trial that by this, he meant that employees should sign a separate sheet which stated that they had read and understood the harassment policy.[4]

He also admitted, however, that he may have told plaintiff something to the effect of "we have no sexual harassment policy."

Sometime in January 1999, plaintiff asked Hirsch and Teeter to move Knox to another grinding stall where she would not have contact with him.[5] They refused,

---

**3.** According to Hirsch, the matter was closed because Knox admitted that he had offered plaintiff money in exchange for sex. This explanation contradicts his claim that Knox denied propositioning plaintiff and asserted that plaintiff had offered him sex in exchange for money.

**4.** In fact, the following day, on January 8, 1999, Hirsch had the grinders and finishers read and sign forms which acknowledged that they had read the pre-existing sexual harassment policy. Knox testified that he signed the policy after he "glanced at it."

**5.** Plaintiff testified that she could not totally avoid the grinders because her locker was in

stating that Knox would be uncomfortable in another stall because he had worked in that location for a long time. Plaintiff testified that Hirsch offered to move her from her job as a muller operator to the core room, but that she viewed this as punishment.[6] Plaintiff then asked that she be moved to the line. According to Hirsch, a supervisor objected to this suggestion because he thought that plaintiff had not performed well when she worked there before. Hirsch checked plaintiff's file, however, and it did not reflect a poor performance on the line. Hirsch testified that defendant decided to let plaintiff move to the line, but that she quit before the transfer was effective.

On January 14, 1999, plaintiff's attorney sent Didion a letter which alleged that defendant had subjected plaintiff to continuing sexual harassment and retaliation. This letter was plaintiff's first complaint directly to Didion, defendant's president, and as far as plaintiff knew, it was the first time Didion had heard anything about her complaints.

Shortly after this, plaintiff and Joseph met with Didion and complained about the hostile work environment and what they perceived as retaliation from Knox, Dezotell and Curtis. Although Didion seemed very upset with plaintiff's choice of lawyer, he took no personal action in response to the complaints. He relied on Hirsch and a lawyer whom Hirsch had retained to handle the situation.

Hirsch testified that on January 19, 1999 he again met with plaintiff to discuss her complaints. He then talked with all of the grinders and became aware of further allegations. Sometime in January 1999, plaintiff heard reports that Knox had threatened that if anything happened to his job

he would "kill the bitch." Then, on January 21, 1999, plaintiff went to get a drink of water by the stairs leading to the break room. Joseph apparently was in the break room. A short time later, Curtis told plaintiff that Dezotell had told him that plaintiff was in the break room talking to Joseph when she should have been working. When plaintiff denied this, Curtis yelled at her, poked her in the chest, called her a "fucking liar" and "wrote her up" for the incident.

Plaintiff left work on January 22, 1999 and never returned. She submitted a written resignation on January 28, 1999. After she left the foundry, plaintiff applied for jobs at several large manufacturers, including Swift and a candy manufacturer. A month or two after she left the foundry, she saw an ad for jobs at a boat manufacturer, applied, and started to work there six to eight weeks after she left the foundry. Plaintiff presented evidence that in the approximately seven weeks that she was unemployed she would have earned $2,030 working at the foundry.

To plaintiff's knowledge when she left the foundry in late January, defendant had not punished anyone for the harassing behavior. On January 25, 1999, Hirsch interviewed Knox but he "pled the Fifth" when asked about the cast iron penises. On January 26, defendant's representatives, including Teeter and defendant's attorney, interviewed Knox again. At that time Knox admitted that he had asked plaintiff if she shaved her private parts and that he pretended to hump castings. Knox also stated that he had "found" the rings and asked plaintiff to marry him.

Hirsch testified that after the investigation, he was not sure who was telling the

6. Virginia Dame, a supervisor, testified that a move to the core room would not be a demotion but rather would be a lateral move.

their area, and her work required that she drive her fork lift to their area.

truth, but was certain that Knox had done something inappropriate. Defendant therefore suspended Knox for a week without pay and moved him to the second shift for two weeks.[7] Defendant also suspended Dezotell, Knox's supervisor, for one week without pay for allowing horseplay and harassment. Defendant also suspended Curtis for several days without pay for allowing employees under his supervision to wander around and failing to respond to complaints.

During plaintiff's employment, defendant had a written policy which prohibited discrimination and sexual harassment. Defendant gave plaintiff an employee handbook which contained the policy, and she signed a receipt which indicated that she had read the handbook. The policy provided as follows:

> Junction City Foundry, Inc., expressly prohibits any form of unlawful employment harassment based on race, color, religion, sex, national origin, age, or handicap. Improper interference with the ability of Junction City Foundry, Inc. employees to perform their expected job duties will not be tolerated. Any unlawful harassment should be reported immediately to the personnel director, or, if in your opinion reporting to the Personnel Director would be improper under the circumstances, it should be reported to the plant manager or Steve J. Didion.

With respect to sexual harassment, Junction City Foundry, Inc., prohibits:

1. Unwelcome sexual advances: requests for sexual favors and all verbal or physical conduct of a sexual or otherwise offensive nature, especially where submission to such conduct is made either explicitly or implicitly a term or condition of employment; submission to or rejection of such conduct is used as the basis for decisions affecting an individual's employment; where such conduct has the purpose of affecting or creating an intimidating, hostile, or offensive working environment.

2. Offensive comments, jokes, innuendos or other sexually-oriented statements.

Exhibit E, p. 2.

### Analysis

Defendant asserts that it is entitled to judgment as a matter of law because the record lacks sufficient evidence to support a jury finding that defendant subjected plaintiff to a hostile work environment and retaliated against her for engaging in activity protected by Title VII. Alternatively, defendant asserts that it is entitled to a new trial because the jury verdict with respect to liability, compensatory damages and punitive damages was contrary to the clear weight of the evidence and the jury considered matters outside the evidence in returning its verdict. Alternatively, defendant asserts that it is entitled to a new trial or remittitur on both the compensatory and punitive damages.

### I. Motion for Judgment as a Matter of Law

At the close of plaintiff's evidence and again at the close of all evidence, defendant sought judgment as a matter of law under Fed.R.Civ.P. 50(a). The Court took the motions under advisement. Defendant now renews its motion for judgment as a matter of law under Fed.R.Civ.P. 50(b).

### A. Hostile Work Environment

 Defendant asserts that as a matter of law, its employees did not create a

---

**7.** Knox testified, however, that his supervisor (Dezotell) told him that he thought the discipline was "bogus" and that he was suspend-ing Knox only because the lawyer said to do so.

hostile work environment. To establish a hostile work environment under Title VII, plaintiff must show that (1) she is a member of a protected class; (2) the conduct in question was unwelcome; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) some basis exists for imputing liability to the employer. See *Brandau v. State of Kan.*, 968 F.Supp. 1416 (D.Kan. 1997).

 To prevail under a hostile work environment theory, plaintiff must show that sexually-oriented conduct had the purpose or effect of unreasonably interfering with her work performance or created an intimidating, hostile or offensive working environment. See *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The existence of such an environment can only be determined by looking at the totality of the circumstances present in the workplace, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*, see also *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). The Court evaluates these factors from both a subjective and an objective viewpoint. See *Harris*, 510 U.S. at 21, 114 S.Ct. 367. The Court must consider not only the effect the discriminatory conduct actually had on the plaintiff, but also the impact it likely would have had on a reasonable employee in plaintiff's position. See *Davis v. United States Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir.1998).

Defendant concedes that plaintiff is a member of a protected class, but challenges plaintiff's proof on each of the four remaining elements.

1. Unwelcome Conduct

 Defendant asserts that plaintiff did not show that the inappropriate sexual conduct of her co-workers was unwelcome. "In order to constitute harassment the conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." *Bales v. Wal–Mart Stores, Inc.*, 143 F.3d 1103, 1108 (8th Cir. 1998). The question is whether under the totality of the circumstances plaintiff indicated by her conduct that the alleged harassment was unwelcome. See *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 69, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Quick v. Donaldson Co.*, 90 F.3d 1372, 1378 (8th Cir.1996) (context is relevant, and may include such things as plaintiff's sexually provocative speech).

Defendant points to testimony that plaintiff repeatedly visited Knox at his work station although she had no business purpose there, and that she spent break hours and lunch hour at his station. Defendant also relies upon testimony that her supervisors, particularly Curtis, warned plaintiff to stay at her work station. Plaintiff, however, presented evidence on which jury could properly find that plaintiff did not welcome the questioned conduct. Curtis testified that plaintiff complained to him about inappropriate sexual comments and conduct by Knox and Dezotell. Plaintiff testified that she found the conduct offensive, and that she ignored it when possible. Although defendant presented evidence that plaintiff sometimes wore suggestive clothing and made sexual comments, plaintiff denied that she encouraged inappropriate sexual comments and conduct by Knox and Dezotell. Viewing the evidence in the light most favorable to plaintiff, the jury was entitled to find from this evidence that plaintiff did

not welcome the inappropriate sexual conduct of her fellow employees.

### 2. Harassment Based on Sex

 Defendant next contends that plaintiff did not produce evidence that the harassment was based upon her gender. As defendant points out, work place harassment is not automatically discrimination based on sex merely because the words "have sexual content or connotations." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Thus, in a work environment in which men and women engage equally in behavior such as telling dirty jokes or discussing sexual matters, there is no discrimination on account of sex. Defendant points to testimony that the grinders and core room workers, including plaintiff, engaged in harmless sexual banter. Further, defendant notes that other workers made teasing remarks of a sexual nature to Knox, one of the alleged harassers.

 Although the record contains evidence that the foundry workers engaged in sexual banter aimed at both men and women, plaintiff presented evidence that fellow employees singled her out for sexual comment and conduct that was based upon her sex. Conduct that is overtly sexual may be presumed to be because of the victim's gender. See *id.* at 80–81, 118 S.Ct. 998; *Penry v. Fed. Home Loan Bank*, 155 F.3d 1257, 1261 (10th Cir.1998). The jury could properly find on this record that the harassment of plaintiff was indeed based on her gender.

### 3. Hostile or Abusive Environment

 Defendant next asserts that plaintiff did not produce evidence that the alleged harassment affected a term, condition or privilege of her employment. In support of this argument, defendant points to evidence that defendant promoted plaintiff to a lead position and that plaintiff demonstrated the requisite skill and knowledge to competently perform her duties.

 Defendant's argument misses the mark. The law does not require plaintiff to show that the abusive work environment tangibly impaired her work performance. See *Harris*, 510 U.S. at 21, 114 S.Ct. 367; see also *Davis*, 142 F.3d at 1341 (trial court erroneously concluded that plaintiff who is successful in job cannot as a matter of law subjectively perceive work environment as abusive). Whether a work environment is hostile or abusive is disjunctive, "requiring that the harassing conduct be sufficiently pervasive or sufficiently severe to alter the terms, conditions, or privileges of [p]laintiff's employment." See *Smith v. Norwest Fin. Acceptance Inc.*, 129 F.3d 1408, 1413 (10th Cir.1997). "[I]solated incidents of harassment, while inappropriate and boorish, do not constitute pervasive conduct." *Id.* at 1414.

Plaintiff testified that Knox repeatedly offered her cash if she would give him her underwear, wash his windows naked or lie naked in his bed. He asked her if she shaved her pubic hair and slapped her on the buttocks. Further, he attempted to show her his exposed penis while he was on the workroom floor. Although defendant countered this testimony with evidence that it would have been difficult for plaintiff to see Knox from her work space, plaintiff testified that she saw him trying to expose his penis to her. She became alarmed when Knox told coworkers that she was tied up in his basement, and that he had a blow-up doll at home named Diana. Plaintiff also points to evidence that Dezotell, Knox's supervisor, asked plaintiff to show him her breasts, and that co-workers spread rumors about her sexual activity. Further, co-workers gave cast iron penises to plaintiff on two occasions,

and repeated the underwear remark frequently.

Plaintiff produced evidence that Knox, Dezotell and other workers made numerous inappropriate, offensive sexually suggestive comments to and about her within an eight or nine month period. Further, although Knox did not physically threaten her face-to-face, he told co-workers that he would "kill the bitch" if he lost his job because of her complaints. Taken as a whole and viewed in a light favorable to plaintiff, the facts set forth above are sufficiently pervasive to create an objectively hostile work environment, and the jury was well within its prerogative in so finding.

4. Employer Liability

■■■ Under Title VII, an employer may be held liable for hostile work environment sexual harassment committed by one employee against another if the employer negligently or recklessly fails to respond to the harassment. See *Hirschfeld v. N.M. Corrections Dep't*, 916 F.2d 572, 577 (10th Cir.1990). "This liability attaches when a plaintiff establishes that an employer had actual or constructive notice of the hostile work environment and failed to respond adequately to that notice." *Davis*, 142 F.3d at 1342. Defendant asserts that plaintiff has not shown that it knew or should have known of the harassment and failed to take "prompt remedial action."

a. Knew/Should Have Known

■■■■ Defendant points out that on two occasions when plaintiff had direct contact with Didion, she had a chance to complain to the CEO about sexual harassment, yet elected not to do so. Defendant asserts that "[p]laintiff cannot provide a good explanation as to why she failed to follow this avenue of redress." Defendant's Motion For Judgment As A Matter Of Law At The Close Of Plaintiff's Evidence. (Doc. # 98) filed March 14, 2001,

at 5. Of course, plaintiff need not explain why she did not personally complain to Didion, as long as she presented evidence that defendant knew or should have known of the sexual harassment. Plaintiff testified that she complained to her supervisor (Curtis) and two human resources directors (Wheeler and Hirsch, her successor) before her attorney wrote a letter to Didion. Defendant's policy on sexual harassment authorized plaintiff to complain to the human resources director, and plaintiff was not required to also complain to Didion. Plaintiff's evidence that she reported the harassment to Curtis, Wheeler and Hirsch is sufficient for a jury to find that defendant knew or should have known of the harassment.

b. Failure to Adequately Respond

■■■ Defendant asserts that even if it knew or should have known of the harassment, plaintiff did not present evidence that defendant failed to take "prompt and effective remedial action." Defendant's use of this language invokes the affirmative defense "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Defendant did not plead this affirmative defense or request an instruction on it, and this argument is therefore immaterial. Given the issues in this case, the real issue is whether plaintiff presented evidence on which a jury could find that defendant failed to take measures reasonably calculated to stop the harassment. See *Baty v. Willamette Indus.*, 172 F.3d 1232, 1241–42 (10th Cir.1999) (employer is negligent with respect to sexual harassment if it knew or should have known about conduct and failed to stop it). The Court addresses defendant's argument within that factual and legal framework.

Defendant asserts plaintiff did not "officially" notify it of her complaints until December 11, 1998. Plaintiff and Curtis both testified, however, that plaintiff complained to Curtis beginning in March or April 1998, shortly after Knox and Dezotell began making inappropriate sexual remarks to her. Plaintiff also points to testimony that even after she complained to Wheeler about Dezotell and Knox, the harassment continued for months.

According to defendant, any claim that it did not take prompt remedial action in response to plaintiff's complaints to Wheeler is time-barred because Wheeler's failure to investigate must have occurred before she left the foundry in early August of 1998, and the period of limitations here extends only to August 23, 1998.[8]

Defendant apparently argues that any duty to take prompt and effective remedial action attached to Wheeler personally and did not extend to the company at large. Defendant's liability, however, attached when plaintiff established that defendant had actual or constructive notice of the hostile work environment (here, March or April of 1998), and did not adequately respond to that notice. Once plaintiff reported harassment to Curtis, defendant had knowledge of the alleged harassment. He passed this information to Wheeler. When she left, her successor had actual or constructive knowledge of the information and defendant had a continuing obligation to take remedial action. The Court can not find, as a matter of law, that defendant had only until early August, 1998, when Wheeler left to respond. In addition, plaintiff also complained to Curtis, a supervisor, who worked for defendant throughout plaintiff's tenure and who could have

taken action on her complaints. Further, under the continuing violation doctrine, if the incidents before August 23 were part of a continuing pattern of discrimination, plaintiff could still challenge incidents that occurred outside the statutory period. See *Baty,* 172 F.3d at 1247 n. 8. It is bizarre to argue, as defendant appears to assert, that defendant is not liable for failure to respond before August 23, 1998, when the same failure to respond continued after August 23, 1998. Furthermore, even if the Court were to accept defendant's argument on this point, it is not clear that its finding would have any rational consequence relative to the jury verdict in this case.

Plaintiff also presented evidence that even after she directly complained to Hirsch in December of 1998, the harassment did not end.[9] The jury could reasonably find that defendant knew or should have known of the hostile work environment and failed to take steps to remedy the situation. See *Hall v. Gus Constr. Co.,* 842 F.2d 1010, 1016 (8th Cir.1988) (employer liable because construction foreman had actual knowledge of sexual harassment of female employees because they complained to him and he personally observed some incidents of harassment). In short, the record contains sufficient evidence on which a reasonable jury could find defendant liable on plaintiff's claim of sexual harassment.

**B. Retaliation Claim**

In order to establish a prima facie case of retaliation under Title VII, plaintiff must show that (1) she engaged in protected activity, e.g., opposition to dis-

---

**8.** Plaintiff filed her charge of discrimination June 18, 1999; thus the 300 day limitations period runs back only to August 23, 1998. Wheeler left defendant's employ a week or two before that, in early August.

**9.** Although plaintiff did not complain to Didion until shortly before she left her job, her complaints to her supervisor and the personnel managers provided defendant constructive or actual knowledge of the harassment.

crimination or participation in a proceeding under Title VII; (2) she suffered an adverse employment action contemporaneous with or subsequent to such opposition or participation; and (3) a causal connection links the protected activity and the adverse employment action. See *Penry,* 155 F.3d at 1263. Plaintiff can establish the causal connection by evidence of circumstances which justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action. Once plaintiff establishes a prima facie case, the burden of production shifts to defendant to produce a legitimate, nondiscriminatory reason for the adverse action. If evidence of a legitimate reason is produced, plaintiff may still prevail if she demonstrates that the articulated reason was a mere pretext for discrimination. See *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Tex. Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); see also *MacDonald v. Delta Air Lines, Inc.,* 94 F.3d 1437, 1441 (10th Cir.1996).

### 1. Protected Activity

Title VII establishes two categories of protected activity-opposition and participation. See 42 U.S.C. § 2000e–3(a) (prohibiting retaliation because an employee "has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter"). "A plaintiff may maintain an action for retaliation based on participation in a protected proceeding regardless of whether the conduct forming the basis of her underlying complaint is adjudged to violate Title VII." *Jeffries v. Kansas,* 147 F.3d 1220, 1231 (10th Cir.1998). Complaints to management, even informally, can under some circumstances be sufficient to invoke

the participation clause. See *id.* at 1231 & n. 9.

Defendant asserts that plaintiff has not presented evidence that she had a good faith, reasonable belief that defendant discriminated against her. See *Mann v. Hutchinson Public Schools,* 202 F.3d 282, 1999 WL 1092594, at *2 (10th Cir. Nov.23, 1999); *Love v. Re/Max of Am., Inc.,* 738 F.2d 383, 385 (10th Cir.1984) ("opposition activity" is protected even when based on mistaken good faith belief). Defendant argues that plaintiff could not have had a good faith belief that the conduct she complained of violated the law because she welcomed or solicited the conduct. This argument essentially rehashes the issue whether plaintiff welcomed the harassment claim of her fellow employees. The Court has already determined that plaintiff presented sufficient evidence to support a jury finding that she did not welcome the conduct of which she complained. The record contains evidence on which the jury could reasonably find that when plaintiff complained of hostile work environment sexual harassment she had a good faith reasonable belief that she was being subjected to such harassment.

### 2. Adverse Employment Action

Defendant argues that plaintiff has not shown that it took adverse employment action against her. Defendant points out that a mere inconvenience or alteration of job responsibilities is not adverse employment action. See *Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 532 (10th Cir. 1998). Defendant focuses on evidence that defendant ultimately offered to honor plaintiff's request for a transfer back to the "line" but that she instead resigned, and points to case law that a lateral transfer is not an adverse employment action. See *Doe v. Dekalb County Sch. Dist.,* 145 F.3d 1441, 1452 (11th Cir.1998) (transfer

not demotion because new position had same salary, benefits, seniority and relative level of prestige).

Plaintiff counters that her claim of adverse employment action rests on evidence that defendant constructively discharged her; specifically, that defendant's employees and supervisors engaged in retaliatory acts that caused plaintiff to resign because working conditions were so intolerable that plaintiff had no choice but to quit. In *Gunnell v. Utah Valley State College*, 152 F.3d 1253 (10th Cir.1998), the Tenth Circuit determined that an employer may be liable for retaliatory conduct by co-workers if supervisory or management personnel either orchestrated the retribution or knew about it and acquiesced in it so as to encourage the actions of co-workers. See *id.* at 1264; cf. *Woodward v. City of Worland*, 977 F.2d 1392, 1402 (10th Cir. 1992) (actions toward plaintiffs by supervisors and co-workers such as not including them in conversations and meetings, laughing as they went by, and segregating and investigating them created jury question whether plaintiffs had been constructively discharged).

Plaintiff produced evidence that after she complained, employees spread rumors that she was sleeping with Joseph, that she was pregnant with his child and that the company "paid her off." Plaintiff testified that Knox sent her a pigeon with a broken wing and she heard reports that Knox said that he would "kill the bitch" if defendant fired him on account of her complaints. Defendant asserts that plaintiff can not rely upon retaliatory harassment by a co-worker because she has not shown that supervisory or management personnel orchestrated the retribution or knew about it and acquiesced in it so as to encourage the co-workers' actions. See *Gunnell*, 152 F.3d at 1264.

The Court agrees that plaintiff produced no evidence that defendant's supervisors or managers *orchestrated* the retribution. But when plaintiff told defendant about the pigeon and the "kill the bitch" comment, defendant took no immediate action. Perhaps a jury could infer that defendant acquiesced in Knox's behavior, although plaintiff does not assert that Knox engaged in specific retaliatory action after she made her reports to Hirsch. Plaintiff's evidence of co-worker retaliation, standing alone, is probably insufficient to support a Title VII retaliation claim. But that is not the end of this analysis.

Plaintiff's retaliation claim is somewhat of a hybrid. She contends that defendant knew that co-workers were harassing her, that management did not respond to her complaints, and that her supervisor disciplined her for conduct which he previously had not criticized. Plaintiff argues that these facts created an adverse employment action-a constructive discharge. Plaintiff produced evidence that shortly after her complaints in December and January, Curtis yelled at her, called her a liar and wrote her up for being out of her work area. Further, at the time of plaintiff's resignation, even after several meetings with plaintiff, defendant still had not informed plaintiff of any planned discipline for the conduct of which she had repeatedly complained. Plaintiff produced evidence which supports the jury finding that defendant made her working conditions so intolerable that a reasonable person in her position would have felt compelled to leave her employment. See *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612 (8th Cir. 2000) ("half-hearted" responses to plaintiff's complaints, threats against her job, poorly conducted investigation and failure to transfer plaintiff or harasser left plaintiff with no choice but to quit.)

Defendant asserts that the evidence does not support a finding that defendant constructively discharged plaintiff,

pointing out that it offered to transfer her to a different work environment.[10] Plaintiff declined to accept the transfer and quit. She contends that a reasonable person would have found no choice but to quit rather than transfer, because of the facts outlined above: the fact that defendant had allowed the harassment to continue for months despite her complaints, the threat by Knox, the refusal to transfer Knox, the failure to discipline plaintiff's alleged harassers, and plaintiff's sudden discipline by Curtis. Although this is a close case, the Court finds that a reasonable jury could find that under the totality of the circumstances plaintiff had no choice but to quit.

### 3. Causal Connection

Finally, defendant contends that plaintiff did not set forth sufficient evidence of a causal connection between the protected activity and adverse employment action. Defendant argues that plaintiff presented no evidence of any intolerable conditions that could constitute retaliatory adverse employment action in response to her complaints before December 1998. Specifically, defendant states that

> the only evidence of intolerable conditions to which the plaintiff was subjected from April 1998 to December 1998 were the alleged sexually harassing comments of David Knox and one isolated incident of a sexual nature involving Dennis De-

zotell. Yet this evidence goes to the plaintiff's separate claim of sexual harassment. There is no claim that other employees were threatening her, spreading rumors about her, writing her up for unsubstantiated reasons or otherwise treating her differently because she allegedly complained. These later claims were raised by the plaintiff some time after her December 1998 complaint to Fred Hirsch, not before.

Defendant's Renewed Motion For Judgment As a Matter Of Law (Doc. # 110) at 4. The fact that the rumors, threats, and write-up occurred *after* her complaint to Hirsch supports plaintiff's claim that the acts were in retaliation for her report of sexual harassment. See *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 550 (10th Cir. 1999) (actions by employer taken within weeks of complaint supports causal connection). Plaintiff need not show that the harassment that spurred her complaints was also in response to the complaints, nor logically could she. As outlined above, plaintiff produced evidence on which a jury could find that the sexually hostile work environment triggered her complaints and that after she complained, other co-workers and supervisors engaged in retaliatory conduct. The causal connection between the protected activity and the adverse action is inherent in the alleged retribution.

---

**10.** Plaintiff testified that defendant only offered to transfer her to the core department Defendant's Motion For Leave to File Surreply To Plaintiff's Reply Suggestions In Support Of Motion For Attorney's Fees (Doc. # 125) filed June 29, 2001. She stated that this was not acceptable because she had begun her work in the core room and she viewed a transfer back to that department as punishment. Plaintiff points to no testimony that a transfer to the core room would be a demotion, however, and defendant cites testimony of Virginia Dame that a transfer to the core room was a lateral transfer. Under Tenth Circuit law, a lateral transfer alone is

not an adverse employment action. See *Sanchez*, 164 F.3d at 532 (transfer from teaching fourth grade at one school to teaching second grade at another school not adverse employment action; primary inconvenience plaintiff suffered was increased commute). Defendant also presented evidence that it decided to offer plaintiff a transfer to the line, a transfer which she herself requested, but plaintiff testified that defendant only offered to move her to the core room. Nonetheless, plaintiff's subjective opinion that such a transfer would be punishment does not suffice to rebut defendant's evidence that a transfer to the core room was a lateral move.

Defendant also points out that it issued Joseph a statement of clarification for being outside his work area, and asserts this evidence disproves the theory that it singled out plaintiff for a similar write-up because she had complained. Plaintiff notes that Joseph had also complained about the sexual harassment of plaintiff, however, and that defendant's evidence actually supports plaintiff's theory that defendant issued the statement of clarification in retaliation for protected activity by Joseph.

Defendant also contends that plaintiff "has a timing problem" because any retaliatory conduct which Wheeler orchestrated or condoned occurred before the first or second week of August, 1998, when Wheeler left defendant's employ, and the 300 day limitations period for plaintiff's claim of retaliation ran back only to August 23, 1998. Defendant further asserts that plaintiff presented no evidence of retaliatory conduct between August 1998 (when Wheeler left) and early January of 1999. Defendant contends that (1) the jury could consider as retaliatory only that conduct which occurred after plaintiff complained to Hirsch in December, 1998; (2) that Knox's only inappropriate conduct after December 11, 1998, was his purported comment that he would "kill the bitch" if he lost his job; and (3) Dezotell did not engage in any inappropriate conduct toward plaintiff after the Spring of 1998 except that he told Curtis that plaintiff was outside her work area.

Defendant bases its timing argument on three erroneous assumptions: (1) that Wheeler had to orchestrate or condone any actionable retaliation before plaintiff complained to Hirsch, (2) that plaintiff did not complain to Curtis, and (3) that the letter to Didion from plaintiff's lawyer did not factor into defendant's retaliation.

▪ The evidence of a casual link between the protected activity and the retaliation must be viewed in the totality of the circumstances. Plaintiff produced evidence that after allowing the harassment to continue for months despite her complaints, defendant failed to take action on the threat by Knox. Moreover, after Didion received a letter from plaintiff's attorney which outlined her complaints, Curtis disciplined plaintiff for something for which he normally would not have disciplined her, and defendant still refused to take any discipline against the alleged harassers. This evidence is sufficient for a jury to find a causal link between the protected activity and the retaliation.

C. Compensatory Damages

▪ Defendant asserts that plaintiff's claim for lost wages must fail as a matter of law. The Court first notes that although the jury awarded plaintiff $2,030 in back pay as a remedy for defendant's retaliatory discharge, an award of back pay is an issue for the Court. See 42 U.S.C. § 2000e–5(g) (court may order equitable relief including back pay if court finds respondent intentionally engaged in unlawful employment practice); *Baty v. Willamette Indus.*, 985 F.Supp. 987 (D.Kan.1997). Further, an award of back pay is not subject to the damages cap. See 42 U.S.C. § 1981a(b)(2),(3). Plaintiff produced evidence that she was unemployed for approximately two months and that she suffered lost wages in the amount of $2,030.

Defendant asserts that plaintiff is not entitled to back wages because she did not mitigate her damages, asserting that plaintiff made no attempt to find a job for approximately two months after she left the foundry, and that she stayed at home for a while of her own accord. Defendant also cites plaintiff's testimony that when she applied for a job with a boat manufacturer, the company hired her almost imme-

diately. The Court's review of the record, however, indicates that plaintiff applied for other jobs before the boat manufacturer hired her, and that plaintiff started work there within six to eight weeks after she left the foundry.

In response to defendant's motions, plaintiff does not respond to its argument that she is not entitled to back wages. Failure to mitigate damages, however, is an affirmative defense. See *United Int'l Holdings, Inc. v. The Wharf, Ltd.,* 210 F.3d 1207 (10th Cir.2000). Defendant produced no evidence that the boat manufacturing job was available two months earlier, or that any other specific jobs at any given rates were available. Based on the evidence at trial, the Court concludes that plaintiff is entitled to an award of back pay in order to make her whole. See *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (once plaintiff establishes liability, absent special circumstances court should award back pay). The Court finds that plaintiff should be compensated for the period of unemployment and that $2,030 is the amount that she would have earned. Further, the court will order prejudgment interest on the back pay award at the Kansas statutory rate of 10 per cent. See K.S.A. § 16–201; see also *Daniel v. Loveridge,* 32 F.3d 1472, 1478 (10th Cir.1994) (court authorized under Title VII to grant prejudgment interest on back pay);*DuBose v. Boeing Co.,* 905 F.Supp. 953, 960 (D.Kan.1995) (granting interest on Title VII back pay award at statutory rate). This amount is not subject to the statutory cap.

## D. Punitive Damages

The jury awarded plaintiff $30,000 in punitive damages on her sexual harassment hostile work environment claim and $100,000 in punitive damages on her retaliation claim. The Civil Rights Act of 1991 allows plaintiff to recover punitive damages only if she proved that defendant acted with "with malice or reckless indifference" to her right to be free from hostile work environment sexual harassment. See 42 U.S.C. § 1981a(b)(1); *Fitzgerald v. Mountain States Tel. & Tel. Co.,* 68 F.3d 1257, 1262 (10th Cir.1995); see also *Knowlton v. Teltrust Phones, Inc.,* 189 F.3d 1177, 1186 (10th Cir.1999).

Defendant asserts that plaintiff presented insufficient evidence that its conduct was reckless or malicious. "Malice" and "reckless indifference" in this context refer not to the egregiousness of the employer's conduct, but rather to the employer's knowledge that it may be acting in violation of federal law. See *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). Recklessness and malice are inferred when a manager responsible for setting or enforcing policy in the area of discrimination does not respond to complaints, despite knowledge of serious harassment. See *Baty,* 172 F.3d at 1244–45.

In this case, plaintiff introduced evidence which entitled the jury to find that she complained to Curtis, who forwarded her complaints to Wheeler, and that she later complained to Hirsch about sexual harassment by Knox, Dezotell and others. Plaintiff presented evidence from which a reasonable jury could infer that management did not respond to her complaints for some time, then performed an investigation that actually worsened the situation. On this evidence a jury could reasonably conclude that defendant acted with malice or reckless indifference with respect to sexual harassment, entitling plaintiff to punitive damages.

The Court's jury instruction on punitive damages stated in part:

If you find from a preponderance of the evidence that plaintiff is entitled to actu-

al damages, you may, but are not required to, award punitive damages in addition to the other compensatory damages mentioned in other instructions. Punitive damages may be imposed in order to punish the wrongdoer for extraordinary misconduct, and to serve as an example or warning to others not to engage in such conduct.

If you find by a preponderance of the evidence that defendant was not making good faith efforts [11] to enforce an anti-discrimination policy, you may award punitive damages. You must further find, however, that defendant acted with malice or with reckless indifference to the federally protected right of plaintiff to be free from sexual harassment and retaliation.

"Malice" is a state of mind characterized by an intent to do a harmful act without a reasonable justification or excuse. An act is "maliciously" done if prompted or accompanied by ill will, or spite, or grudge toward the injured person. An act is done with "reckless indifference" if it is done in reckless or callous disregard of, or indifference to, the rights of the injured person.

Whether to make an award of punitive damages, in addition to actual damages, is a matter exclusively within the province of the jury. You may not award punitive damages unless you award actual damages . . .

Jury Instruction No. 23.

Defendant notes that this instruction contains language from the holding of *Kolstad*, 527 U.S. at 545, 119 S.Ct. 2118: "in the punitive damages context, an employer may not be vicariously liable for the dis-

criminatory employment decisions of managerial agents where these decisions are contrary to the employer's good faith efforts to comply with Title VII." Defendant asserts that in order to award punitive damages under Kolstad, the jury must determine both that (1) the actor whose objectionable conduct is imputed to the employer was aware of the risk that the conduct violated federal law, and (2) the actor served the employer in a managerial capacity. See *Lowery v. Circuit City Stores,* 206 F.3d 431, 442 (4th Cir.2000).

■■ Defendant asserts that plaintiff did not present evidence to meet this test. Defendant contends Knox and Dezotell, whose conduct formed a large part of plaintiff's sexual harassment and retaliation claims, do not serve in a managerial capacity and thus their actions cannot precipitate a punitive damages award. The Court agrees with this point.

Defendant apparently asserts that the jury could not have awarded punitive damages based on conduct by Hirsch and Wheeler because "this theory was not submitted to the jury," i.e. by invoking the "good faith" language from Kolstad, the jury instruction on punitive damages foreclosed the jury from awarding punitive damages based on conduct by Hirsch and Wheeler. To support its contention, defendant reasons that (1) the Court included the Kolstad good faith language in the punitive damages instruction; (2) under Tenth Circuit law, the Kolstad good faith defense does not apply if the individual designated as the final decision-maker with authority for implementing the company's anti-discrimination policy is the person charged with engaging in the objectionable conduct; [12] (3) Hirsch and Wheeler are

---

11. Because the Tenth Circuit had not definitively stated whether the Kolstad good faith efforts is an affirmative defense, see *Cadena v. Pacesetter,* 224 F.3d 1203, 1209 (10th Cir.

2000), plaintiff in this case agreed to accept the burden of proof on this issue.

12. The Tenth Circuit's discussion of Kolstad was as follows:

such final decision-makers; and (4) by agreeing to the Kolstad language, plaintiff waived any claim to punitive damages based on conduct by Hirsch and Wheeler. Suggestions In Support of Defendant's Renewed Motion For Judgment As A Matter Of Law Or, in the Alternative, Motion For New Trial Or Remittitur (Doc. # 111) filed March 30, 2001, at 14. If this is really defendant's argument, it is incomprehensible. The Court does not understand how instructing the jury on the Kolstad good faith "defense" foreclosed the jury from finding that defendant acted with malice or reckless disregard to the federally protected rights of plaintiff.

Perhaps, however, defendant is asserting that plaintiff's claims were based on mere negligence, which will not support an award of punitive damages. But the instructions required that to award punitive damages, the jury had to find that defendant was not making good faith efforts to enforce an antidiscrimination policy. This language implicitly required the jury to consider actions by managers of the company. The Court acknowledges that the instruction could have more clearly stated that mere negligence by an employer was not enough to support punitive damages. But given the instructions and course of proceedings, the Court is satisfied that the jury indeed based the punitive damage awards on the actions of management, and that it found the required malice or reckless disregard.

Considering the evidence as a whole, the Court concludes that the record is sufficient to support the punitive damage awards.

## II. Motion For New Trial

As an alternative to its motion for judgment as a matter of law, defendant moves for a new trial or remittitur.

### A. Verdict Contrary To Clear Weight Of The Evidence

Defendant asserts that it is entitled to a new trial because the jury verdicts on liability and damages were contrary to the clear weight of the evidence.[13] The Court rejects this argument. Plaintiff and Curtis were credible witnesses. In contrast some defense witnesses (notably Wheeler) lacked credibility and others (notably Hirsch) were inconsistent. The weight of the evidence was not clearly in defendant's favor. Thus, for essentially the reasons set out in denying defendant's motion for judgment as a matter of law, the Court finds that the jury verdict is supported by the evidence and should not be disturbed.

It is certainly true, as the Supreme Court recently stated, that in the context of punitive damages, an employer may not be liable for the discriminatory employment decisions of management-level employees where these acts are contrary to good-faith efforts on the part of the employer to comply with Title VII. See *Kolstad*, 119 S.Ct. at 2129. This principle is meant to advance the purposes of Title VII by encouraging the remediation and prevention that lie at the heart of the statute's goals. *Id.* It would defeat these purposes to hold an employer strictly liable for the acts of rogue managers when it has made every effort to comply with Title VII's requirements. However, Kolstad was a case involving vicarious liability, unlike this case which is premised on a theory of direct liability. Thus, the good-faith defense does not apply. It is negated by a showing of direct malice or reckless indifference to federally protected rights of Ms. Deters, by Mr. Taylor who was designated by the company as a final decision-making authority responsible for implementing the company anti-discrimination policy office.
*Deters v. Equifax Credit Info.*, 202 F.3d 1262,-1271 (10th Cir.2000).

**13.** Although the Court excluded some of the evidence which defendant proferred during a hearing pursuant to Rule 412, Fed. R. Civ. P, defendant does not assert any evidentiary issues in its motion for new trial.

B. Punitive Damages Contrary To Constitutional, Common Law, And Statute

 Defendant asserts that even if plaintiff is entitled to punitive damages, the jury award is excessive and contrary to constitutional, common law and statutory criteria. Defendant thus requests a remittitur or a new trial. The Supreme Court has articulated the standard for constitutionally excessive punitive damages awards. See *BMW of North Am. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *Continental Trend Res. Inc. v. OXY USA Inc.,* 101 F.3d 634, 636 (10th Cir.1996). One must receive fair notice both of the conduct that will subject him to punishment, and the possible severity of the punishment that may be imposed. See *Continental Trend,* 101 F.3d at 636 (quoting *BMW,* 517 U.S. at 574, 116 S.Ct. 1589). Three "guideposts" guide the fair notice analysis. See *BMW,* 517 U.S. at 574–75, 116 S.Ct. 1589. First, and most important, is the reprehensibility of defendant's conduct. See *id.* Second, is the ratio of the punitive damages awarded to the actual harm inflicted on plaintiff. See *id.* The third guidepost compares the punitive damages award with "the civil or criminal penalties that could be imposed for comparable misconduct." *Id.* Additionally, in analyzing a punitive damages award for excessiveness, the Court considers the goal of deterrence. See *Continental Trend,* 101 F.3d at 641. Defendant's size and wealth are relevant factors in this regard. *Id.*

Defendant asserts that each of the guideposts point to a conclusion that the punitive damage awards in this case are excessive. First, defendant argues that although in other circumstances the conduct of Knox and Dezotell could be considered reprehensible, in this case it was not. Defendant contends that plaintiff was a willing participant in sexual banter and horseplay which precipitated the harassment; that the jury realized that plaintiff had participated in some of the "escapades;" and that the jury therefore awarded a "paltry" sum for compensatory damages despite plaintiff's evidence that she suffered depression as a result of defendant's conduct. Therefore, defendant reasons, its conduct cannot be viewed as reprehensible. The Court reiterates, however, that in holding defendant liable for sexual harassment, the jury necessarily rejected defendant's argument that plaintiff welcomed the conduct of which she complained. The record contains ample evidence that defendant engaged in sexual harassment which was reprehensible in both its quality and duration.

Further, by virtue of the language of Title VII, defendant had notice that it could be subject to punitive damages for involvement in discriminatory practices with malice or with reckless indifference to an individual's federally protected rights. See 42 U.S.C. § 1981a(b)(1); see also *Baty,* 172 F.3d at 1244 (holding that provision for punitive damages in statute itself constitutes notice). The jury heard evidence that despite repeated notice of sexual harassment, defendant failed to take prompt and appropriate corrective action reasonably calculated to end the harassment; in fact, Curtis and Wheeler apparently took no action whatsoever. Defendant had fair notice that it could be exposed to punitive damages in the circumstances.

 Defendant argues that the Court must reduce the punitive award for the sexual harassment claim because the ratio of punitive to compensatory damages—30 to one—is wholly disproportionate. See, e.g., *Rubinstein v. Administrators of the Tulane Ed. Fund,* 218 F.3d 392 (5th Cir.2000) (punitive damages of $75,000 excessive in view of $2,500 actual damages award). Although a six to one ratio may

be a constitutional limit in purely economic injury cases where injury is not hard to detect, see *Continental Trend*, 101 F.3d at 639, low awards of compensatory damages may support a higher ratio if an egregious act has resulted in a small amount of economic damages. See *id.* Additionally, as in cases where the injury is primarily personal, a greater ratio may be appropriate. See *id.* at 638. The Court finds that the ratio between the compensatory and punitive damages awards for the sexual harassment claim in this case is not unconstitutionally disproportionate.

In assessing the reasonableness of the punitive damage awards the Court must consider the purposes of such a remedy, namely to punish and deter. On this point, defendant's wealth and size of the defendant are relevant considerations. See *id.* at 641. Although neither party points to specific evidence on this issue, the jury could infer from the evidence that defendant has a sizable work force and is a well established business in its market sector. This factor also supports the punitive damages award of $30,000 on the sexual harassment claim.

 Defendant also asserts that the punitive damage award on the retaliation claim is excessive. The jury awarded plaintiff $18,030 in compensatory damages and $100,000 in punitive damages. Defendant asserts that the evidence of retaliation does not support this punitive damage award. Defendant asserts that the only evidence of constructive discharge were the rumors by other employees, the statement of clarification by Curtis, and Knox's threat to a third party that if he lost his job, he would "kill the bitch." As previously discussed, however, plaintiff also presented evidence concerning defendant's unreasonable response to her complaints.

Defendant once again argues that plaintiff was a willing participant in sexual banter and horseplay, and that for that reason, rumors by employees cannot be regarded as offensive. The Court has already addressed this argument and will not revisit it. Defendant asserts that Curtis' conduct cannot be seen as reprehensible because defendant also disciplined Joseph for being outside his work area. As previously noted, however, Joseph had complained to defendant about its treatment of plaintiff, so this evidence actually suggests retaliation against both Joseph and plaintiff.

Defendant further asserts that Knox's threat cannot be considered reprehensible because it was not made directly to plaintiff, and she continued to work for a week after the comment. But the threat alone is not the basis for the punitive damages.

Finally, defendant argues that the actual damages for both the sexual harassment and retaliation claims are excessive, and therefore the punitive damage awards are also excessive. Defendant asks the Court to remit the punitive damages award to $5,000. The Court declines to do so for the reasons set forth above.

## C. Jury Misconduct

 Defendant asserts that it is entitled to a new trial because the jury improperly considered matters outside the evidence in returning its verdict. After the trial, the Court called the jury into the courtroom and allowed the attorneys to speak with the jury. This conference was not on the record. Defendant contends that at the conference,

> two jurors indicated that they relied on matters outside the evidence in reaching their verdict. Specifically, juror Noone indicated that he habitually received a notice in his paycheck once a quarter regarding sexual harassment. Another juror, indicated that she was trained on sexual harassment annually. All of the jurors indicated that this information

was a key component in their jury deliberations and their finding of liability against Defendant. (See Affidavit of Celena Smith attached hereto and incorporated herein by this reference. The defendant also asks the court to take judicial notice that the jury relied on the sexual harassment policies of Noone's and the other juror's employers in reaching its verdict.) However, the jury was not instructed to consider their own employer's sexual harassment policies when viewing the evidence in this case. Clearly the jury relied upon facts and circumstances outside the Court's instruction.

Suggestions In Support Of Defendant's Renewed Motion For Judgment As A Matter Of Law Or, In The Alternative, Motion For New Trial Or Remittitur (Doc. # 111) filed March 30, 2001, at 20.

The Court agrees that during the conference, two jurors mentioned the practices of their own employers in regard to sexual harassment policies. The jurors generally made various comments which reflected their view, which was manifest in the verdict, that defendant had not adequately responded to plaintiff's complaints of discrimination. In the course of that discussion with counsel, two jurors cited their own experiences as examples of

means by which defendant could have more rigorously communicated its anti-harassment policy and required employees to acknowledge their understanding of that policy. None of the jurors stated that they based their verdict on the personal employment experiences of these two jurors, and such reliance would have been inconsistent with the issues submitted for their decision. The suggestion that all of the jurors indicated that this information was a "key component in their jury deliberations and their finding of liability against defendant" is a grossly self-serving mischaracterization of the exchange between counsel and the jury. But that is beside the point.

"A rebuttable presumption of prejudice arises whenever a jury is exposed to external information in contravention of a district court's instructions." *Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919, 922 (10th Cir.1992) (citing *United States v. Hornung*, 848 F.2d 1040, 1044–45 (10th Cir.1988)). Once the district court determines that a jury has been exposed to external information in contravention of its instructions, the court must then examine the facts and circumstances of the case in order to determine whether this presumption has been overcome.[14]

---

**14.** In *Smith v. Ingersoll–Rand Co.*, 214 F.3d 1235 (10th Cir.2000), the Tenth Circuit acknowledged that:

[u]nfortunately, this Court appears to have developed two different standards by which a trial judge is to assess the impact of exposure to extraneous material on a jury. In one vein of our case law, we have held jury exposure to extrinsic material warrants a new trial if there is the 'slightest possibility' the exposure affected the verdict. See *United States v. Byrne*, 171 F.3d 1231, 1235–36 (10th Cir.1999).

In a second vein, we have held jury exposure to extraneous information creates a "presumption of prejudice" which may be rebutted by showing the exposure was harmless. See *United States v. Aguirre*, 108 F.3d 1284,

1288 (10th Cir.1997); [ ] *Mayhue v. St. Francis Hosp. of Wichita, Inc.*, 969 F.2d 919, 922–26 (10th Cir.1992)....

One may posit factual distinctions between the situations in which this Court has employed the presumption of prejudice approach and those in which we have employed the slightest possibility approach: generally, we appear to use the latter when unadmitted trial exhibits stray into the jury room, while the former is generally applied where jurors actually come into contact with third parties.

214 F.3d at 1241 (some internal citations omitted) (declining to resolve this "bifurcation in our case law" and finding that under either standard objecting party not harmed by presence of extrinsic material in jury room).

Defendant relies upon Mayhue, a race discrimination in employment case in which the trial court granted a new trial. During deliberations the court denied the jury's request for a dictionary. After the verdict, however, court staff found a handwritten note with definitions of various words, including "discriminate" and "prejudice." The court held a hearing and found that the foreperson had written the note and read it to the jury on the day it reached its verdict. Reviewing for an abuse of discretion, the Tenth Circuit upheld the district court's grant of a new trial.

Mayhue does not control this case. First, the Court instructed the jury in this case as follows:

> In considering the evidence in this case, you are expected to use your good sense. Consider the evidence only for those purposes for which it has been admitted, and give it a reasonable and fair construction in light of your common knowledge and experience. However, you should not be influenced by anything not within the issues of this case. Both the parties and the public expect that you will carefully and impartially consider all of the evidence properly before you in the case, follow the law stated by the court and reach a just verdict, regardless of the consequences. Keep constantly in mind that it would be a violation of your sworn duty to base a verdict on anything but the evidence in the case.

Even if two jurors discussed with the jury their own experiences with sexual harassment training practices or policies, such information falls within the instruction that jurors consider evidence "in light of [their] common knowledge and experience." Such information is not presumptively prejudicial because it fails to show that the jury was exposed to "external information in contravention of a district court's in-

structions." See *Mayhue*, 969 F.2d at 922. Cf. *Stiles v. Lawrie*, 211 F.2d 188, 190 (6th Cir.1954) (juror brought highway manual to trial which purported to show speed of vehicle on basis of skid marks; trial testimony included length of skid marks; required new trial).

■ Defendant asserts that jury reliance on extraneous information is error even when information does not stem from an outside source but rather comes from a juror who is privy to items outside common knowledge. See *People v. Edgerton*, 115 A.D.2d 257, 495 N.Y.S.2d 858 (4th Dept.1985). In this case, however, the challenged information is more in the nature of common knowledge and thus is not a proper basis for challenging the verdict. See *Silagy v. Peters*, 905 F.2d 986 (7th Cir.1990) (jurors' discussion of erroneous beliefs regarding possible sentences in criminal trial not external influence and thus not subject to inquiry under Fed. R.Evid. 606(b)).

■ Further, contrary to defendant's assertion, none of the other jurors suggested that the experiences of these two jurors were material to their decision in this case. Even assuming that the jury was exposed to information on sexual harassment policies of other employers in contravention of the jury instructions, such exposure would be harmless. Jurors in employment cases are bound to have personal experiences with a multitude of issues regarding employee hiring, discipline, management, and so forth. The purpose of voir dire is to weed out those potential jurors who would let such matters of common knowledge and experience influence their judgment in this case. To say that jurors cannot invoke the common sense which they have acquired through their personal employment experiences, on penalty of committing reversible error, would guarantee an employer a new trial of virtu-

ally any adverse judgment. The Court is satisfied that the jury decided this case based on the Court's instructions regarding the law and the evidence which it heard from the witness stand—consistent with repeated instructions during voir dire and at the conclusion of the trial. The Court therefore declines to order a new trial, or to hold a hearing to examine the jurors.

### D. Statutory Cap

■ The total jury award of $147,000 is subject to the statutory cap of $100,000. See 42 U.S.C. § 1981a(b)(3)(B) (limiting damages in case of defendant who has more than 100 and fewer than 201 employees in each of 20 or more calendar weeks in the current or preceding calendar year to $100,000). The back pay award of $2,030, however, constitutes equitable relief and thus is not subject to the statutory cap. See 42 U.S.C. § 2000e–5(g), *Baty*, 985 F.Supp. at 987. The Court therefore finds that plaintiff is entitled to a judgment of $102,030.00.

### III. Plaintiff's Motion For Attorney's Fees

Plaintiff seeks attorneys' fees of $84,587.50 and expenses totaling $7,161.98, and post-trial fees of $9,075. See Plaintiff's Suggestions In Support Of Motion For Attorneys Fees (Doc. # 117) filed April 26, 2001. In Defendant's Response To Plaintiff's Motion For Attorneys Fees (Doc. # 123) filed June 22, 2001, and Defendant's Motion For Leave to File Surreply To Plaintiff's Reply Suggestions In Support Of Motion For Attorney's Fees (Doc. # 125) filed June 29, 2001, defendant asserted that it cannot adequately respond to plaintiff's motion until after this Court has entered judgment on the merits of the case.

**IT IS THEREFORE ORDERED** that on or before **August 1, 2001**, defendant file an amended response to plaintiff's motion for attorneys fees.

**IT IS FURTHER ORDERED** that plaintiff file any reply to defendant's amended response on or before **August 13, 2001.**

**IT IS FURTHER ORDERED** that Defendant's Motion For Judgment As A Matter Of Law At The Close Of Plaintiff's Evidence (Doc. # 98) filed March 14, 2001, Defendant's Motion For Judgment As A Matter of Law At The Close Of All The Evidence (Doc. # 102) filed March 16, 2001, and Defendant's Renewed Motion For Judgment As A Matter of Law Or, In The Alternative, Motion For New Trial Or Remittitur (Doc. # 111) filed March 30, 2001, be and hereby are **OVERRULED.**