**Janice E. STEVENS, Plaintiff,**

v.

**DELUXE FINANCIAL SERVICES, INC., Defendant.**

**No. CIV.A. 01–2135–KHV.**

United States District Court, D. Kansas.

April 16, 2002.

Alan V. Johnson, Stephen D. Lanterman, Sloan, Listrom, Eisenbarth, Sloan & Galssman, Topeka, KS, David W. White, Foland & Wicens, P.C., Kansas City, MO, for plaintiff.

Paul E. Donnelly, Brian R. Markley, Cherie Leigh Durst, Stinson Morrison Hecker LLP, Kansas City, MO, Helaina Bardunias, Gunster Yoakley & Stewart, Ft. Lauderdale, FL, for defendant.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Plaintiff alleges that defendant terminated her employment because of race in violation of 42 U.S.C. § 2000 et seq., and retaliated against her because of complaints of racial discrimination, in violation of 42 U.S.C. § 1981. This matter is before the Court on Defendant's Motion For Summary Judgment (Doc. # 47) filed January 15, 2002 and Plaintiff's Motion For Leave To File A Supplemental Memorandum In Opposition To Defendant's Motion For Summary Judgment (Doc. # 56) filed March 19, 2002. For reasons stated below, the Court sustains both motions.

### Factual Background

Plaintiff has filed a surreply which alleges that defendant's reply raises new arguments which necessitate a response. Under D. Kan. Rule 7.1(b), parties are permitted to file a dispositive motion, a response, and a reply. Surreplies are typically not allowed. See *Metzger v. City of Leawood,* 144 F.Supp.2d 1225, 1266 (D.Kan.2001). On the other hand, Federal Rule of Civil Procedure 56(c) requires that the nonmoving party be given notice and a reasonable opportunity to respond to movant's summary judgment materials. Thus, when a reply advances new reasons or evidence in support of a motion for summary judgment, the nonmoving party should be granted an opportunity to respond. If the district court grants summary judgment for movant without relying on new materials and arguments in the reply brief, however, it may preclude a surreply. See *Beaird v. Seagate Tech., Inc.,* 145 F.3d 1159, 1164 (10th Cir.1998) (court may either permit surreply or refrain from relying on new material in reply brief). In this case the Court will allow plaintiff's surreply and will consider the arguments presented therein.

The following facts are either undisputed or, where disputed, construed in the light most favorable to plaintiff.

Deluxe Financial Services ("Deluxe") manufactures and sells checks and related products. Basic checks are printed at one of two distribution centers and sent to

imprint plants where they are customized with name, address, bank and account number information. In the early 1990s, Deluxe had more than 60 plants and distribution centers. Since that time, however, electronic banking has reduced the need for paper checks. Today Deluxe has only 11 plants and two distribution centers.[1] One distribution center is the Kansas City Distribution Center ("KCDC") in Lenexa, Kansas, where Deluxe employed approximately 140 to 150 workers throughout 2000. About a mile away, Deluxe operates "the Renner Building," a plant which employed approximately 275 workers in 2000.

Separate from the manufacturing operation, Deluxe maintains a customer support organization which processes orders and supports financial institution customers. The Renner Building is a part of this separate organization. Customer support units receive information through multiple routes, including mail centers which they operate. Until very recently, a mail center supported the Deluxe customer service unit in Lenexa. In November 2001, however, Deluxe closed this mail center.

In January 2000, Lindsay Jones, an African American male, was operations manager for KCDC. Jones had developed a system of Microsoft Access databases to collect daily reports.[2] Sometime in 1999, Jones decided to employ two people in the same pay grade as "administrative assistant."[3] The two positions were first included in the KCDC budget and organizational chart which Deluxe approved in 1999.

On January 21, 2000, plaintiff, who is African American, applied and interviewed for one of the two administrative assistant positions. Deluxe offered plaintiff the job on February 15, 2000, and she began work two weeks later. Shortly after it hired plaintiff, Deluxe hired Tina Nail as the second administrative assistant. The duties of the two administrative assistants were not precisely the same, but they significantly overlapped. Jones wanted to cross-train plaintiff and Nail so that each could cover all administrative duties if necessary.

In February 2000, Jones filed suit against Deluxe, alleging that it had discriminated against him on account of race. Jones, along with Sherri Vega (a Hispanic woman who had worked in the Human Resources department), went on paid leave in April 2000 and never returned to work at Deluxe. In May 2000, Vega filed suit against Deluxe, alleging that it had discriminated and retaliated against her due to national origin.

To cover ongoing management and human resources needs in the absence of Jones and Vega, Deluxe brought in Pete Godich and Sharon Merget. At the time, Godich was operations manager for a plant

1. In addition to closing facilities and consolidating operations, Deluxe has taken other cost containment actions in the face of shrinking demand for paper checks. The operations manager at each remaining production facility is required to submit an annual budget. If the budget is approved, costs are monitored to determine whether the company is on track to meet annual performance goals. Operations managers are often directed to look for ways to realize additional cost savings-particularly after first quarter income results are known.

2. Deluxe already collected certain performance statistics in a software program called Buford, but Jones wanted to track information that Buford did not capture. To develop this system, Jones worked with Brian Gajewski, a manager-in-training who was very skilled in creating Access databases. Gajewski and Rogers worked together to produce the reports that Jones had requested.

3. Jane Rogers had been the administrative assistant to KCDC until she resigned on January 19, 2000. The day after she resigned, Deluxe announced the opening of two administrative assistant positions at KCDC.

in Streetsboro, Ohio and Merget was an HR employee for two California plants—Antelope Valley and San Jose. Under Godich's leadership, KCDC production has increased and costs have lowered.[4] One piece of the overall cost savings was a reduction in administrative support for the KCDC facility. From his first days at KCDC, Godich questioned why the facility needed two administrative assistants.[5] The role of an administrative assistant varies with the style of the operations manager and, because Godich had a different management style than Jones, he did not require the same resources. The Streetsboro plant, where Godich had previously worked, had only one administrative assistant. Neither of the California facilities which Merget had supported employed more than one administrative assistant. Furthermore, both the California plants had more employees than KCDC.

In late May or early June 2000, Deluxe initiated a cost management effort and asked Godich to do whatever he could to reduce costs.[6] Godich decided that an operation the size of KCDC only needed one

4. For example, by the end of 2001, KCDC operating expenses had been reduced more than $750,000 as compared to 2000—including a four per cent reduction in personnel. Over the same period, production increased six per cent (nearly 100 million additional feet of printing), printing mistakes were reduced 20 per cent and presses operated 13 per cent more often.

5. Plaintiff attempts to controvert this point by stating that KCDC had two administrative assistants before Jones' tenure (DeAnne Cole and Jane Rogers) and also during Vega's employment (Jennifer Hicks and an unidentified person who reported to her). As defendant points out, however, neither of the cited sources supports plaintiff's proposition. Under D. Kan. Rule 56.1(b)(1), "[e]ach fact in dispute ... shall refer with particularity to those portions of the record upon which the opposing party relies." Plaintiff first relies on Defendant's Responses To Plaintiff's First Set Of Interrogatories To Defendant (Exhibit 19) in Appendix To Memorandum Supporting Defendant's Motion For Summary Judgment, Volume I ("Defendant's Appendix, Vol. I") (Doc. # 49) filed January 15, 2002. In those interrogatories, defendant stated that DeAnne Cole or Jane Rogers-not both-had been the administrative assistant between July 1997 and February 2000. Plaintiff also relies on the Deposition Of Sherri Vega in Appendix To Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment ("Plaintiff's Appendix") (Doc. # 52) filed February 8, 2002 at 76. The cited page, however, does not support plaintiff's asserted fact that Jennifer Hicks and another individual were both administrative assistants at the same time. For these reasons, the Court will deem

defendant's proffered fact to be uncontroverted and will not supplement it with plaintiff's statement. See D. Kan. Rule 56.1(a) ("material facts set forth in the statement of the movant shall be deemed admitted for the purposes of summary judgment unless specifically controverted by the statement of the opposing party").

6. Plaintiff attempts to controvert this fact by relying on a time-line of events which she produced at her deposition. See Deposition Exhibit 4 in Plaintiff's Appendix (Doc. # 52). In that time-line, she states that Godich told her that "a corporate decision" had been made to eliminate the two administrative assistant positions and that corporate headquarters had decided that the KCDC facility needed only one administrative assistant. As defendant points out, plaintiff's time-line is hearsay and it contains a second-level of hearsay in the form of plaintiff's summary of Godich's comments. Plaintiff contends that Godich's remark would be admissible at trial as an admission by a party-opponent, even if the time-line itself is hearsay. Under *Thomas v. Int'l Bus. Mach.*, 48 F.3d 478, 485 (10th Cir.1995), plaintiff may testify as to what an authorized agent of defendant tells her because that constitutes an admission of a party-opponent under Fed.R.Evid. 801(d)(2). Examining this testimony in the light most favorable to plaintiff, the Court could conclude that Godich's testimony is not hearsay.

Plaintiff, however, presents the time-line without a citation to deposition testimony which authenticates the exhibit or an affidavit which declares the exhibit to be a true and accurate copy. Under D. Kan. Rule 56.1(d), "[a]ll facts on which a motion or opposition is based

administrative assistant and that he wanted the most qualified person to fill that role. With that goal in mind, Godich asked Merget to help him through the process. To find the most qualified person for the position, Godich and Merget decided to interview candidates and post the position internally and externally—a practice which they have followed for every open position since they arrived at KCDC. This practice is permitted, though not required by Deluxe's internal posting policy.[7]

Deluxe has a detailed handbook titled "Reduction in Force Guide" ("the Guide"). The "Human Resource Policy Manual"

also contains a reduction in force policy. The Guide generally contemplates that a RIF will involve deciding which current employees will retain their positions. The Guide does not mention posting a position internally or externally or selecting among all candidates who apply for a position.[8] The Guide is drafted in permissive rather than mandatory terms. By its own terms, it is subject to change and it is even inapplicable in some situations.[9] The Guide sets forth in detail the guidelines for determining the selection criteria and process for identifying those employees who will retain their employment following a RIF.[10]

shall be presented by affidavit, declaration under penalty of perjury, and/or relevant portions of pleadings, depositions, answers to interrogatories and responses to requests for admission."

Moreover, plaintiff's point is not material. Plaintiff acknowledges that Godich told her that defendant had directed him to cut costs at the facility. See Deposition Of Janice Stevens (Exhibit 17) in Defendant's Appendix, Vol. I (Doc. # 49) at 160. Plaintiff's only dispute is whether Godich told her that *he* had made the decision to eliminate the administrative assistant position (his version of events) or whether he told her that corporate headquarters had made the decision (plaintiff's version of events).

7. Plaintiff attempts to controvert these facts by pointing to testimony that before Godich and Merget arrived, positions had not been posted externally. This does not controvert defendant's assertion that after Godich and Merget arrived, all positions have been posted internally and externally. The Court will therefore deem this fact admitted.

8. The reduction in force policy provides:

Business Manager is expected to outline the selection criteria and selection process used to identify those employees whose positions will be eliminated versus those who will retain employment. (See RIF Guidebook)

. . . . .

The above steps and policy statements are contained in the Reduction in Force Guidebook. Review it in its entirety, prior to taking any RIF actions.

Deposition Exhibit 45 (Exhibit 41) in Appendix To Memorandum Supporting Defendant's Motion For Summary Judgment, Volume II ("Defendant's Appendix, Vol. II") (Doc. # 50) filed January 15, 2002. Plaintiff suggests that the decision to post the position was contrary to Deluxe's written policy. The Guide, however, does not prohibit the posting of positions following a reduction in force. In addition, the RIF policy was effective on August 1, 1999 and the internal posting policy was effective on October 25, 1999, so the RIF policy predates the internal posting policy. Therefore the Court will disregard plaintiff's proffered supplementation.

9. For example, the paperwork required for a RIF has changed. The Guide suggests that various forms be completed in certain circumstances, such as a job change questionnaire. Deluxe no longer uses a job change questionnaire.

10. For example, the Guide states the following regarding selection criteria:

Identify quantifiable job-related criteria for selecting affected employees to be reduced. The more that quantifiable objective criteria can be used to determine which employees will be affected by a RIF, the more easily understood the reasons for selection. Quantifiable objective criteria may include but is not limited to the following:

- knowledge, skill, and abilities
- quantifiable standards of performance and productivity (e.g. calls per hour, results achieved, revenue dollars generated, etc.)

After adopting the Guide, Deluxe created an on-line computer template to be completed during a RIF. In terms of the paperwork required for a RIF in June 2000, the template completely superseded the Guide and Merget completed every form on the computer template.

Consistent with Deluxe's RIF Policy and Guide, Merget wrote an email to Deluxe headquarters about Godich's decision to eliminate an administrative assistant position and the process which they intended to use to select the most qualified person for the remaining position.[11] To her email, she attached the computer template

- ability to perform job tasks other than those the employee is principally assigned to perform
- length of service/seniority
- length of service in the position
- years of relevant job-related experience
- attendance

. . . . .

If performance review data is unavailable or unusable, other criteria may need to supplement or replace it. Alternative sources of candidate information may include but are not limited to:
- Resumes and/or a Deluxe job change questionnaire (paper application)
- Job interviews
- Work sample assessments or other assessment results (i.e. external assessment processes)

Deposition Exhibit 46 in Defendant's Appendix, Vol. II (Doc. # 50) at 15–16.

11. In each RIF, paperwork explaining the business reasons for the reduction, and the selection process and criteria, is sent to Cyndie Szczepanski at Deluxe headquarters in Minnesota. Szczepanski has reviewed approximately 132 reductions in force of various sizes, ranging from plant closings to the elimination of a single position. In all of those reductions, Deluxe has used seniority only in certain voluntary severances, i.e. when too many employees volunteer to accept a severance package.

12. Plaintiff attempts to controvert and supplement this fact by stating that Merget did not follow the correct procedure for a RIF because she did not identify selection criteria for

forms—RIF checklist, comparative list, workforce analysis (employee detail) and workforce analysis (decisional unit).[12] Merget explained the business reasons for having one administrative assistant instead of two: the facility did not have enough work for two administrative assistants and eliminating one position would save approximately $32,500. She also explained that after the position was posted both internally and externally, the most qualified person would be selected through an interview process.[13] In at least one other instance, however, Deluxe had stopped Jones from forcing employees to reapply for their positions during a RIF.[14] Accord-

the restructured position or implement a selection process for retaining or hiring an employee. Defendant concedes that Merget did not decide on criteria for the position. As discussed below, Godich delegated that task to another employee. Merget, however, did implement a selection process of posting the position internally and externally and interviewing candidates.

13. At one of Deluxe's California facilities, Merget had personally been through a RIF that used this procedure. While she was working as an intermediate Human Resources generalist in Antelope Valley, Deluxe changed how the facility would be supported by Human Resources. As a result, Merget had to reapply for her position after it had been advertised externally. In this process, some incumbent employees were terminated and some personnel were hired from the pool of external candidates.

14. Jones was involved in a RIF in 1999 and he explored the possibility of having all affected employees reapply for their positions. He referred to this process as a "parking lot routine," but did not implement it because Deluxe managers said they did not wish to use that methodology.

Jones said
I got the name parking lot routine from Kevin Harrison, as a matter of fact, who was a prior Human Resource manager, ... you create new jobs, you disqualify everybody, and then everybody has to go out to the parking lot and then reapply and be brought back in. We—Kevin suggested

ing to at least two other Human Resources employees, the procedure which Deluxe used in eliminating the administrative assistant position was unusual.[15] Deluxe does not have a policy which requires that RIFs be accomplished on the basis of seniority,[16] however, and Merget concluded that neither Nail or plaintiff had worked at Deluxe long enough to establish a track record as the most qualified employee. In fact, both were still in their "introductory periods." [17] Merget believed that employment less than 180 days was insufficient to establish a track record of performance. On May 22, 2000, however, plaintiff had received a satisfactory 90 day performance review from Gajewski.[18] Gajewski did note that plaintiff needed development in the areas of computer and initiative/follow up skills.

On June 8, 2000, Godich and Merget met individually with plaintiff and Nail to inform them about the restructuring. During the meetings, Merget gave plaintiff and Nail a complete set of the computer template forms for employees involved in a RIF: official notification of job elimination, severance support plan, severance release form and comparative list. In each meet-

that and we explored it and the Human Resource people firmly discouraged that type of process. Said Deluxe—that violated the Deluxe way, Deluxe values, and we weren't to proceed in that manner.
Deposition Of Lindsay Jones in Plaintiff's Appendix (Doc. # 52) at 19–20. Jones and Harrison wanted to use this procedure to force a majority of Deluxe employees to reapply for their jobs so that they could get rid of undesirable employees. Deluxe told Jones that this proposal was unacceptable and that he was not to proceed with it.

15. Vega was involved in a RIF in the sales department where 40 positions were reduced to eight. Deluxe retained eight of the 40 employees in their positions and the positions were not re-advertised. Based on her experience at Deluxe, Vega opined that
The fact that they reposted her position is not anything I'd ever seen in Deluxe's past practices, nor is it anything I've ever seen in any of my professional experiences at the corporations I've worked for. Generally, if you eliminate a position, you don't repost the exact same position. There is usually some changes [sic] in that or it is a totally different job. From my understanding, Janice's exact position was posted.
Deposition Of Sherri Vega in Plaintiff's Appendix (Doc. # 52) at 72–73. Shannon Rome, who is currently employed as a Human Resources associate generalist at Deluxe, also discussed the procedure:
It was against anything that we had done before. And so it was very out of the ordinary. And, you know, if there only needs to be one of those positions and there's two

people in it, there's usually some type of criteria, you know, to reduce one of those positions, not reduce both of them and repost it again. Basically right there [they have] said you're already not good enough.
Deposition Of Shannon Rome in Plaintiff's Appendix (Doc. # 52) at 149.

16. Under the Guide, a manager may use length of service as a criterion but is not required to do so. In the Guide's example of how length of service may be used, the shortest length of service considered is five years. The example measures seniority in terms of years, not days or months.

17. Deluxe employees have a 180 day "introductory period." In the last part of May and early part of June 2000, plaintiff had worked three months and Nail had worked one month.

18. The purpose of the review was to let plaintiff know how she was doing so there was no surprise when it was time for the final review. According to Gajewski's evaluation notes, he told plaintiff
Good job staying on top of what is going on in your area, i.e., Julie being on vacation . . . way to take charge and open the building. Travel plans and meeting notes are well done; I also feel that you are getting a good handle on preparing for our Team Managers meeting.
Deposition Exhibit Six (Exhibit 21) in Defendant's Appendix, Vol. I (Doc. # 49). Merget never spoke with Gajewski regarding the 90–day review.

ing, Godich and Merget explained that KCDC only needed one administrative assistant.[19] As a result, one administrative assistant position was going to be eliminated and the remaining position was going to be posted internally and externally. In successive meetings, plaintiff and Nail were told that they were eligible to apply for the open position.[20]

Godich wanted to use a selection process that was fair and would be perceived as fair by everyone involved. The first step of the process was culling through resumes and conducting screening interviews to select candidates for final interviews. Godich wanted someone to conduct the screening who had not been previously involved with plaintiff or Nail. Under Deluxe's internal job posting policy, the Human Resources representative was expected to screen all internal applicants to determine if they met the minimum qualifications of the posted position. See Deposition Exhibit 65 (Exhibit 52) in Defendant's Appendix, Vol. II (Doc. # 50). The policy did not address who was to screen external candidates. Id. Because Godich did not know all of the HR personnel at the Renner building, he asked Dan Schwartz (its operations manager) to recommend someone to do the screening interviews.[21] Schwartz recommended Jennifer Hicks, the administrative assistant for the Renner Building, whom Godich did not know.[22] Because Hicks was the sole administrative

19. As discussed above, the parties disagree whether Godich told plaintiff that corporate headquarters had determined that one position should be eliminated or whether he said that he had done so.

20. At her meeting, Nail stated that she was not surprised that Deluxe had decided to eliminate one administrate assistant position. She had previously wondered why Deluxe had two administrative assistants because there was not enough work for two people to do. Nail asked when she could apply for the opening.

In her meeting, plaintiff stated that "there should be no problem keeping me and letting [Nail] go" because she had worked at Deluxe about a month and a half longer. Deposition Of Janice Stevens (Exhibit 17) in Defendant's Appendix, Vol. I (Doc. # 49) at 160:18–19.

21. In late June and early July 2000, Merget was the only HR employee responsible for KCDC. Merget was regularly traveling back and forth between Kansas City and the California plants that she was supporting, and she also had a scheduled vacation. Therefore she could not conduct the screening interviews. The other resident HR employees were Chris Gajewski, who supported the Renner building; Gajewski's assistant Jackie Brown; Janelle Harvey Jordan, who supported Data Client Management (the Renner Building and mail center); and Jordan's assistant Shannon Rome.

Gajewski, who is white, supervised both plaintiff and Nail. He had told Godich that Nail was much stronger than plaintiff and that plaintiff needed development. In light of these statements, Godich was concerned about how plaintiff would perceive Gajewski as a screener and he wanted someone else. Brown, who is African American, had been involved in Nail's screening interview and strongly supported her initial hire. Godich decided not to use Rome because she had been involved in plaintiff's initial hire and he was concerned that Nail might perceive her as biased.

Plaintiff attempts to cast doubt on Godich's asserted reason for not having Rome interview the candidates by alleging that Rome had been involved in Nail's interview and would have had equal exposure to the candidates. The evidence, however, shows that Rome was uncertain whether she had been involved in Nail's interview and that it was actually Brown who had conducted the interview. The record does not reveal Godich's rationale for not using Harvey Jordan.

22. Before the interview process, Hicks did not have any significant contact with plaintiff. Prior to June 8, 2000, plaintiff and Nail had planned to meet with Hicks so that Hicks could show them around the Renner building and explain how bulletin boards were handled in that facility. The meeting never took place and, other than that contact, plaintiff did not know anything about Hicks.

assistant for a production facility, she had a clear understanding about what was required to be successful in that role. Schwartz also told Godich that Hicks did a very good job. Hicks had worked as an HR staff assistant before going to the Renner Building in February 1999.[23] She was not in the Human Resources unit in June 2000, however, and she had never conducted any interviews for an administrative assistant position. According to Rome and Vega (who had already left her employment at Deluxe), it was not proper for Hicks to screen internal candidates for KCDC.[24] Merget not aware of another instance in which someone outside of HR conducted screening interviews for any administrative assistant position.

Vega believed that Hicks had racist attitudes.[25] She had never personally heard

---

**23.** In her HR position, Hicks did screening interviews for approximately 30 positions. Hicks received training from Deluxe on how to interview. She enrolled in and completed seminars titled "Interviewing Skills," "Laws Pertaining to Hiring, Firing and Interviewing" and "Interviewing People." Additional seminars that she has completed include "Management Skills for Executive Secretaries and Administrative Assistants," "The Exceptional Assistant," "Advanced Power Point 4.0" and "Excel Advanced Course: Macros." Hicks sought out and completed each of these courses on her own. Deluxe later reimbursed her expenses as part of its continuing education program for employees.

**24.** Rome testified that it was "completely out of the ordinary" for Hicks to conduct the screening interviews, Deposition Of Shannon Rome in Plaintiff's Appendix (Doc. # 52) at 161, but she admitted that due to her Human Resources experience, Hicks was qualified to do so. Rome had no problem with Hicks conducting interviews for an administrative assistant position in the Renner Building, but she disagreed with Godich's decision to have Hicks conduct interviews for KCDC.

Defendant contends that Vega's testimony is inadmissible because at the time of the screening interviews, she no longer worked at Deluxe. Vega, however, is competent to testify about Human Resources practices at Deluxe of which she has personal knowledge. Based on her previous experience at Deluxe, Vega believed that it was improper to have Hicks involved in the hiring process. She testified that "[t]he fact that she handled this was totally out of—I have not worked anywhere where an administrative person would hire another administrative person, do the posting, the interviewing, and prepare a test." Deposition Of Sherri Vega in Plaintiff's Appendix (Doc. # 52) at 73. The evidence, however, shows that Godich—not Hicks—made the hiring decision.

**25.** Vega's belief was based in part on third-party reports from Karen Thompson, who told Vega that she had overheard Hicks use a racial epithet. Vega's testimony on this point includes double hearsay. It is well-established that "[h]earsay testimony cannot be considered because a third party's description of [a party's] supposed testimony is not suitable grist for the summary judgment mill." *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir.1995) (citations and quotations omitted); cf. Declaration Of Karen E. Thompson (Exhibit 3) in Defendant's Reply Appendix (Doc. # 55) at ¶ 9. Plaintiff defends Vega's deposition testimony by asserting that it is not offered to prove the truth of the matter asserted (that Hicks is racist) but rather to dispute Godich's assertion that he wanted an unbiased perspective on the job candidates. Plaintiff, however, is offering this testimony to prove the truth of the matter asserted (that Godich selected Hicks because she was racist).

Vega also relied on statements from Barbara Clark Evans, who allegedly stated that Hicks had delayed pay increases and training for African American employees. As an initial matter, plaintiff has not cited relevant evidence of this point. For that reason, the Court must disregard this purported fact. See D. Kan. Rule 56.1(d) ("[w]here facts referred to in an affidavit or declarations are contained in another document, such as a deposition, interrogatory answer, or admission, a copy of the relevant excerpt from the document shall be attached"); see also *Doebele v. Sprint Corp.*, 168 F.Supp.2d 1247, 1252 n. 2 (D.Kan.2001) (fact deemed admitted when party failed to attach appropriate evidentiary support for opposition). Furthermore, Vega's belief is again based on inadmis-

Hicks make a racist comment, but she had referred race-related complaints about Hicks to Chris Gajewski and these referrals caused her to believe that Hicks had racist attitudes.

Godich accepted Schwartz's recommendation, and Schwartz called Hicks to see if she would conduct the screening interviews. Hicks agreed, and she reviewed the job description for administrative assistants and created a decision-making worksheet for the screening interviews.[26] In preparing the initial draft of the decision-making worksheet, Hicks did not look at the position requisition form[27] but she did refer to the job description, which set forth the required knowledge, skills and abilities as follows:

Uses telephone, calculator, personal computer, mainframe terminal, and a variety of software packages.

Effective performance requires a two year secretarial certificate or equivalent experience, good understanding of spreadsheet and word processing software packages, good interpersonal, written and oral communication skills.

Persuasiveness and influencing: Without jeopardizing relationships uses logical reasoning, friendly emotion, and has the ability to give and take and seek consensus when necessary.

Persistence: Has clearly defined objectives and seeks to attain them. Maintains a desire to achieve own goals and is prepared to argue and debate to support them.

Innovative/Creativity: Seeks to provide a variety of approaches to a problem. Takes a creative view of what is required and does not dogmatically seek to correct simplistic view.

Deposition Exhibit 69 in Plaintiff's Appendix (Doc. # 52). In the initial draft of the decision-making worksheet, Hicks listed the following "Required Skills" for the administrative assistant position at KCDC: "Personal computer, MicroSoft [sic] Office Software (Excel, Word, Powerpoint), Written and Oral Communication Skills, Organizational Skills, Telephone Etiquette, Spreadsheet Generation, and Attention to Detail and Accuracy." Deposition Exhibit 20 in Plaintiff's Appendix (Doc. # 52).

On June 12, 2000, Hicks contacted Godich by email and stated "I would be glad to assist you in the selection process for your Administrative Assistant. I've put together a decision-making worksheet for that position based on the job description." Deposition Exhibit 20 (Exhibit 29) in Defendant's Appendix, Vol. I (Doc. # 49). Hicks attached to the email a copy of her initial draft of the decision-making worksheet.

Godich wanted the administrative assistant to have certain computer skills and be able to create reports and charts using Microsoft Word and Excel.[28] Godich and Hicks had discussed the required and preferred skills for the position. This conversation resulted in the final form of the worksheet. Godich said that the final

---

sible hearsay and not personal knowledge. Her opinion is therefore inadmissible.

**26.** A decision-making worksheet lists required and preferred skills for a position. In general, unless no qualified candidates are found, a candidate who lacks any required skills will not be hired.

**27.** According to Merget, the position requisition form contains the same information as the job description.

**28.** Jones had utilized and trained his staff to build reports using Microsoft Access. Godich does not use Microsoft Access and he wanted the administrative assistant to use software he knew—Microsoft Excel and Word—so that he could work on the data himself after hours or on weekends, if necessary. Hicks understood and used Excel and Word and had taken courses in both programs.

form of the worksheet "more accurately represents what the position is accountable for in my mind. This is what I was looking for to fill this role." Deposition Of Peter Godich in Plaintiff's Appendix (Doc. # 52) at 168.

The final form of the decision-making worksheet contains different language from that in Hick's initial draft. It states that the following skills are "required" for the position: Project Mgmt/Problem Solving, Interpersonal/Oral and Written Communication/Listening, Administrative/Customer Service, Prioritize/Organizational, Initiative/Follow Up, Intermediate PC and Negotiation. Deposition Exhibit 21 (Exhibit 30) in Defendant's Appendix, Vol. I (Doc. # 49). Of these, Initiative/Follow Up and Intermediate PC were not listed in Hicks' initial draft. Furthermore, these exact phrases are not used in the job description. Under principal duties and responsibilities, however, the job description lists "[f]ollows up on tasks as requested by manager" and "[s]ees beyond the current problem or solution and generates new ideas or practices." Deposition Exhibit 69 in Plaintiff's Appendix (Doc. # 52). These statements essentially refer to initiative and follow up.[29] Also, the job description repeatedly refers to computer skills.

On June 16, 2000, while Godich and Hicks were working on the decision-making worksheet, plaintiff called the employee hotline to complain that she was being terminated because of racial discrimination.[30] She stated

My point of concern for this call is that in connection with my boss' leave of absence there seems to be a pattern of eliminating people of color from the KCDC. Out of five people of color at KCDC when I started at Deluxe, all five are now removed or in the process of being removed from the KCDC.

Deposition Exhibit 49 in Plaintiff's Appendix (Doc. # 52). Merget was on vacation when plaintiff made the hotline call and did not learn about it until she returned to work on June 23, 2000. Hicks did not know about plaintiff's hotline call at any time prior to this lawsuit.

On June 23, 2000, after she had finalized the decision-making worksheet, Hicks scheduled plaintiff's screening interview for the restructured position.[31] Hicks had finalized the decision-making worksheet before she scheduled any interviews.[32]

Also on June 23, after Hicks and plaintiff had scheduled their interviews, Merget met with plaintiff to discuss her hotline call.[33] Merget understood that plaintiff was complaining about what she perceived

**29.** Vega testified that the purpose of the job description is to provide general information and sometimes certain skills are not listed on the form.

**30.** Deluxe has a hotline that employees can use to report allegations of discrimination. The hotline is an 800 number to Deluxe headquarters in Minnesota, where the call is transcribed. When a hotline call contains allegations of discrimination, the transcription is routed to human resources in Minnesota, which refers the information to the local HR person.

**31.** Hicks received over 30 resumes for the opening. Plaintiff, Nail and a third internal

candidate applied. Hicks decided to interview the three internal candidates and four external applicants.

**32.** Plaintiff attempts to controvert this fact by stating that Hicks could not recall how the final changes were made to the worksheet, but Hicks' inability to recall the procedure by which final changes were made does not controvert her sworn declaration that the changes were made before she contacted the candidates for interviews.

**33.** While she had been on vacation, Merget had received an email containing a transcript of the call. She did not learn of the email until she returned to work.

to be racism. After she learned of plaintiff's hotline call, Merget interviewed the finalists for the KCDC administrative assistant position (which did not include plaintiff). Merget had no other involvement in the hiring process for the administrative assistant position. Furthermore, she did not participate in deciding the criteria for the administrative assistant position.

When Godich had spoken with Hicks about the screening interviews and decision-making worksheet, he had not known about plaintiff's hotline call. On June 24, 2000, however, Merget informed Godich that plaintiff had called the hotline because she was concerned that elimination of the administrative assistant position was an issue of color.[34] After Godich learned about plaintiff's hotline call, his only involvement in the hiring process was to discuss the final two candidates (which, again, did not include plaintiff) and chose between them.

Before the interviews, Hicks prepared a list of questions for each candidate. Hicks went down the list of questions with each candidate, including plaintiff and Nail. The questions were similar to those posed to plaintiff in her other interviews at Deluxe. Hicks consciously tried to interview each candidate in the same way. Hicks interviewed plaintiff on June 27, 2001. Plaintiff found that Hicks' interviewing style was intense; she felt that Hicks was challenging her and after the interview, she told Nail that the interview was intense. Nail responded that she thought that she was the only one with that reaction. Both plaintiff and Nail told Gajewski that Hicks was rigid.

As part of the interview, Hicks asked each candidate to complete an Excel simulation.[35] The simulation, which was exactly the same for each candidate, was based on a worksheet that had names, personnel numbers and production figures for seven employees. Each candidate had to demonstrate knowledge of Excel by manipulating the data in four ways: (1) placing the seven names on a chart in alphabetical order; (2) creating a chart which listed the seven employees in numerical order by personnel number; (3) adding a column to the second chart to show the sum of the seven production figures; and (4) creating a bar graph to show the flow of the seven production figures. Hicks

---

**34.** Plaintiff attempts to controvert this statement by alleging that Godich could have spoken with Hicks on June 24, 2000, when he learned of plaintiff's hotline call, and made further modifications to the decision-making worksheet. The evidence is uncontroverted, however, that Hicks finalized the worksheet before she called any candidates for an interview and that she called plaintiff on June 23, 2000. On June 23, 2000, Godich did not know about the hotline call. Therefore, in modifying the worksheet, he could not have been influenced by the hotline call.

**35.** Godich wanted to make sure that the administrative assistant was able to use Microsoft Excel and Word, and he had the initial idea for the simulation. This is the only time since July 1997 that Deluxe has required KCDC administrative assistant applicants to complete an Excel simulation. Hicks was initially concerned about the simulation and stated, "Before we move toward creating a test to validate skill level, I suggest we let HR become involved. There are restrictions as to how we can test an individual-the test must be a validated test to ensure that it is not biased." Deposition Exhibit 19 (Exhibit 29) in Defendant's Appendix, Vol. I (Doc. # 49). Godich did not want to use a validated test, however, because the primary purpose of the simulation was to let Hicks observe how each candidate used Excel and whether he or she demonstrated an understanding of the program-not to get a correct answer.

Rome testified that Deluxe normally relies on outside agencies to verify 10 key and typing skills. Although tests such as an Excel simulation could be conducted on site, Rome stated that Deluxe could not do the other sort of testing on site.

observed each simulation and recorded observations such as whether the candidate used shortcuts or sort and sum keys.

To plaintiff, the difficulty level of the simulation was basic to intermediate.[36] Plaintiff made numerous errors, however, on the simulation. When summing the production figures, she separated an employee from corresponding production figures because she cut and pasted information to create her charts rather than using Excel tools to manipulate the data.[37] Also, she could not create the requested bar graph.[38]

While the simulation was not like plaintiff's normal work, the purpose of the test was to ensure computer familiarity for the new administrative position—not the position that Deluxe was eliminating.[39] Before June 2000, Godich had not noted any deficiencies in plaintiff's reports. At times, he thought that the reports may have taken longer than expected to produce.

On July 14, 2000, Hicks forwarded to Merget two names for final interviews: Patricia D'Agostino and Joyce Duffin. Both had demonstrated all required skills for the position and in the simulation, both had completed each task while demonstrating knowledge of the Excel program. Hicks had concluded that plaintiff did not demonstrate intermediate computer skills or initiative/follow up-required skills for the position.[40] Hicks also concluded that Nail did not demonstrate the required skills.

Godich was out of town when Hicks completed the screening interviews, so he asked Merget to interview D'Agostino and Duffin. Merget completed the final interviews on July 14, 2000—the same day as Duffin's initial interview. When Merget did her interviews, she had the finalists' resumes, the decision-making worksheets which Hicks had completed, the job description, Hicks' notes from her interviews with D'Agostino and Duffin, and the printed screens from the Excel simulation by the finalists. After Merget finished the final interviews, she called Godich and explained what each finalist had said, focusing on the preferred skills for the position. Merget had no other involvement with the hiring process and Godich decided to hire Duffin.

36. Specifically, she rated alphabetizing seven names and summing seven production figures as basic. She categorized putting seven numbers in order and creating a bar graph as intermediate.

37. For example, in the data given to plaintiff, Michael George had a production figure of 20589. In her chart, plaintiff assigned that number to employee Betty White. Plaintiff only listed the correct production figure for one employee out of seven.

38. Plaintiff's graph had eight bars of information but the simulation only had seven employees.

39. In her job, plaintiff did not produce all of the graphs and charts which KCDC used; Nail and Gajewski also produced documents. Joyce Duffin, who became the new administrative assistant, testified that the manipulations which were required in the simulations are the very manipulations which she uses in her position.

40. Plaintiff notes that intermediate computer skills were not on the initial decision-making worksheet but she cannot deny that intermediate computer skills were on the final worksheet, and she does not deny that she lacks intermediate computer skills. Plaintiff also notes that initiative/follow up was not on the initial draft of the decision-making worksheet but she cannot deny that it was on the final worksheet. While plaintiff asserts that initiative/follow up is a subjective assessment, she does not controvert Hicks' assessment that she lacks those skills. Hicks did not talk to Gajewski about either plaintiff or Nail, but Gajewski observed plaintiff for months as her manager and his assessment was essentially the same, i.e. that she lacked initiative/follow up.

On July 19, 2000, Gajewski and Merget told plaintiff that she had not been selected for a final interview and that her technical skills were not as strong as those of the candidate they had selected.[41] Plaintiff's final day of employment was July 28, 2000, which was also Nail's final day.

Duffin began work on August 7, 2000. She assumed essentially all of the duties which plaintiff and Nail performed in June 2000, and she spends approximately 23–25 hours a week completing reports and graphs for KCDC. In January 2001, Gajewski resigned and Duffin assumed responsibility for all data processing needs at KCDC.

On July 17, 2000—nine days before plaintiff's last day of employment—Deluxe posted an opening for an administrative assistant in the mail center.[42] Plaintiff, Nail and two other internal candidates applied for the position. Deluxe does not give employees who have lost their jobs in a RIF a right to transfer to other open positions of equal or lower pay grades. Such employees may apply for available positions but they do not have automatic transfer rights.

From approximately 1996 until the mail center closed in November 2001, Alba Morales (who is Hispanic) was the mail center leader. The mail center worked with various financial institution customers and had a team of employees specifically dedicated to Bank of America. Morales intended the administrative assistant to support all six management level employees in the mail center and, as needed, all non-management employees. She also intended the administrative assistant to work as a sales associate for the Bank of America team, particularly during "crunch periods," and to field telephone calls from customers with questions or complaints.[43] Before this lawsuit, Morales did not know

41. In her summary judgment response, plaintiff argues that this conversation actually took place on July 11, 2000. In plaintiff's "Employee Documentation Record," Gajewski dated an entry September 12, 2000 and stated that he had spoken with plaintiff about her termination "yesterday." Clearly that date was incorrect since plaintiff was no longer working at Deluxe on September 11, 2000 and plaintiff does not argue that September 11 was the date of the conversation. Merget testified that when she was consolidating plaintiff's files after her termination; she crossed through the September 12 date and penciled in July 12, 2000 because she knew that plaintiff had not been terminated in September. Merget could not remember the date of the conversation in July and assumed that Gajewski had correctly memorialized the date. Moreover, although Merget and Gajewski could not recall the date, plaintiff unequivocally testified in her deposition that the meeting occurred on July 19, 2000.

> Q. Now on your Exhibit No. 4 at page 6, you show a conversation with Brian and Sharon on July 19th. And my question to you is do you have a firm recollection of what date this occurred on?
> A. I thought I had a firm recollection of the date.

> Q. Okay. You believe it was the 19th and not the 12th?
> A. Yeah.
>
> . . . . .
>
> A. I would like to go with my date, July 19th.

Deposition Of Janice Stevens (Exhibit 17) in Defendant's Appendix, Vol. I (Doc. # 49) at 195:14–196:3. Plaintiff's argument contradicts her deposition testimony and is an attempt to create a sham factual issue. Although plaintiff's counsel attempts to argue that the conversation took place earlier, plaintiff's testimony is clear and unequivocal on this point and plaintiff presents no evidence that her earlier testimony was in error. The Court will therefore disregard this contradictory argument.

42. No employee in the mail center, including Alba Morales, the mail center leader, reported to anyone at the KCDC or the Renner Building. The mail center was part of the Deluxe customer support group, a separate business unit that was not affiliated with the production aspects of the business.

43. The job description did not expressly include duties as a sales associate for Bank of America but Ann Whitaker, who previously

about plaintiff's hotline call. When Morales interviewed plaintiff for the mail center position, plaintiff stated that she preferred to work for the highest person in charge and that she preferred to work for one person. Neither preference matched what Morales knew to be the needs of the position. The six management employees at the mail center did not require full-time administrative assistance and, as a result, the person selected for the position had to be prepared to support other employees in the mail center and handle phone calls from Bank of America. At KCDC, plaintiff did not take phone calls from customers with questions and problems.

Morales hired Christine Bonnell for the mail center position. Bonnell had worked as a sales associate on the Bank of America team since February 1999 and had performed well in that position. She had extensive experience handling phone calls from Bank of America. She was an office assistant at a previous employer and she knew how to use various software applications, including Microsoft Word and Excel. Morales concluded that Bonnell had all of the qualifications for the position; and the determinative factor was that Bonnell could step into and perform Bank of America work.

In late July 2000, plaintiff learned that she had not been selected for the mail center position. On August 9, 2000, she completed an intake questionnaire and mailed it to the EEOC. At the time, plaintiff was represented by legal counsel. On August 28, 2000, plaintiff filed a charge of discrimination with the EEOC. The EEOC charge does not mention the mail center position and at the time plaintiff filed her EEOC charge, she did not contend that the mail center hiring decision was discriminatory.[44] On December 15, 2000,

---

worked as administrative assistant, had responded to Bank of America phone calls as needed. Christine Bonnell, who replaced Whitaker, also performed Bank of America duties as needed.

**44.** Plaintiff notes that after she received a right-to-sue letter from the EEOC, she sought reconsideration of the EEOC's decision to not bring suit. In plaintiff's letter of January 8, 2001, she stated

> Please recall the fact that I applied for a second position as Administrative Assistant to Alba Morales, Plant Manager of the Kansas City Mail center (same building). My qualifications far exceed those of the person who received the job. This is not only inconsistent with the company's claim that they make their employment decisions based upon an employee's qualifications, but also with Deluxe's general policy that when my position was eliminated because of the reduction in force, I should have been allowed the opportunity to make the transfer to the other department, even at a lesser pay, if a position was open.

Plaintiff's Exhibit "A" in Plaintiff's Appendix (Doc. # 52). Plaintiff contends that her letter put the EEOC investigator on notice that the mail center hiring decision was discriminatory.

Defendant responds that the Court should not consider the letter because plaintiff did not authenticate it and she did not produce it in discovery. Under D. Kan. Rule 56.1(d), "[a]ll facts on which a motion or opposition is based shall be presented by affidavit, declaration under penalty of perjury, and/or relevant portions of pleadings, depositions, answers to interrogatories and responses to requests for admission." The Court will disregard a summary judgment exhibit which plaintiff has failed to properly authenticate. In her surreply, however, plaintiff has attached a declaration that the letter is a true and accurate copy of her letter to the EEOC. For the purposes of summary judgment, the letter has been properly authenticated.

In addition, defendant argues that it should have received a copy of this letter in response to two production of document requests. Defendant requested "[a]ll journals, letters, notes, diaries, calendars, memoranda or other documents [plaintiff] prepared or kept that mention [plaintiff's] employment with Deluxe or the matters alleged in [plaintiff's] Complaint." Defendant's First Request For Production Of Documents (Exhibit 11) in *Defendant's Reply Appendix (Doc. # 55).*

plaintiff filed a charge of discrimination with the Kansas Human Rights Commission ("KHRC"). Like the EEOC charge, the KHRC charge does not mention the mail center position.

Plaintiff asserts that (1) Deluxe discriminated on account of race .in violation of Title VII, 42 U.S.C. § 2000, by terminating her employment as an administrative assistant and failing to hire her for the KCDC position and mail center position; and (2) because she had called the employee hotline, Deluxe refused to hire her for the KCDC position in violation of 42 U.S.C. § 1981.[45] Defendant contends that it is entitled to summary judgment because (1) plaintiff cannot establish a prima facie case of discriminatory termination or failure to hire; (2) Deluxe had legitimate nondiscriminatory reasons for terminating and not hiring plaintiff; (3) plaintiff has no evidence that the stated reasons are pretexts for discrimination; (4) plaintiff has not exhausted administrative remedies with respect to the mail center position; and (5) plaintiff cannot establish a prima facie case of retaliation.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed.R.Civ.P. 56(c); accord *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga, Okla.,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); see also *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.,* 939 F.2d 887,

Defendant also requested "[a]ll documents that mention or relate to any statement or communication [plaintiff] made relating to the matters alleged in the Complaint." Id. Plaintiff's letter clearly falls within the scope of these requests, yet she did not produce it. Plaintiff's surreply offers no explanation for her failure to produce the letter. Under Fed. R.Civ.P. 37(c)(1), "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." This rule applies to a party's failure to comply with discovery requests. Therefore plaintiff's proffered evidence is inadmissible. See *Millsap v. McDonnell Douglas Corp.,* 162 F.Supp.2d 1262, 1309 (N.D.Okla.2001) (Rule 37 allows court to sanction parties for destroying or withholding documents properly requested during discovery).

**45.** In the Pretrial Order (Doc. # 46), plaintiff asserted that Deluxe also retaliated by failing to hire her for the mail center position. In response to defendant's summary judgment motion, however, plaintiff acknowledges that she has no evidence that Morales knew of her hotline call and that defendant is therefore entitled to summary judgment on this claim.

891 (10th Cir.1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. *Applied Genetics,* 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing summary judgment. See *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1110 (10th Cir.1991). Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. See *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

### Analysis

### I. Discrimination Claims (Count I)

Plaintiff asserts that defendant's decisions to eliminate an administrative assistant position and not hire her for the KCDC or mail center positions were motivated, at least partially, by race. Defendant argues that plaintiff cannot establish a prima facie case of discrimination because plaintiff has no evidence that it intended to discriminate against her in reaching its reduction in force decision.[46]

The Court uses the familiar McDonnell Douglas framework to analyze plaintiff's discrimination claims. Under McDonnell Douglas, plaintiff "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination."

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Once plaintiff has established a prima facie case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its employment action. See *id.* If defendant makes this showing, plaintiff must then show that defendant's justification is pretextual. See *id.* at 804, 93 S.Ct. 1817.

### A. Reduction In Force

■ Plaintiff argues that Deluxe discriminated against her when it decided to restructure the two administrative assistant positions. Defendant argues that plaintiff cannot establish her prima facie case because she has no evidence that it intended to discriminate or that its reasons for consolidating the two positions were pretexts for discrimination.

To make out a prima facie case of discriminatory discharge due to a reduction in force, plaintiff must prove that (1) she is within the protected group; (2) she was doing satisfactory work; (3) she was discharged despite the adequacy of her work; and (4) there is some evidence that Deluxe intended to discriminate against her in reaching its RIF decision. See *Martin v. City of Purcell,* 6 Fed.Appx. 792, 794, 2001 WL 321187 (10th Cir.2001) (applying elements in age discrimination RIF case); *Beaird v. Seagate Technology, Inc.,* 145 F.3d 1159, 1165 (10th Cir.1998). For purposes of summary judgment, defendant concedes that plaintiff can meet the first three criteria and focuses only on the fourth element, arguing that because it treated Nail (a non-minority employee) the way it treated plaintiff, plaintiff cannot prove intent to discriminate.

---

**46.** Plaintiff's reduction in force and failure to hire claims are overlapping but for purposes of clarity, the Court will separate its discussion of each claim.

To establish the fourth element of her prima facie case, plaintiff relies on purported procedural irregularities in the way defendant selected the person to fill the restructured position. Plaintiff asserts that Godich and Merget violated Deluxe written and/or customary RIF policies and procedures by posting the position internally and externally, by failing to select one of the incumbents for the restructured position, and by forcing the incumbents to reapply for the restructured job. Plaintiff relies on Jones' testimony that on one occasion Deluxe discouraged Jones from using the "parking lot procedure" of having current employees reapply for their jobs during an RIF and the testimony of Vega and Rome that defendant's procedures were out of the ordinary, in their experience at Deluxe facilities in Kansas City. In other words, plaintiff attempts to show that discrimination tainted the way in which defendant executed its RIF. Significantly, plaintiff cites no evidence that casts doubt on defendant's stated reason for engaging in the RIF: the facility did not have enough work for two administrative assistants and eliminating one position would reduce costs.[47] Plaintiff has therefore failed to create a genuine issue of material fact as to defendant's decision to combine the two administrative assistant positions. Defendant is entitled to summary judgment on this claim.

## B. Failure To Hire Plaintiff For The Reorganized Position

Plaintiff argues that defendant's failure to hire her for the restructured KCDC position was discriminatory. Defendants contend that the pretrial order has not preserved plaintiff's claim and, if it has, plaintiff cannot establish a prima facie case of discrimination or show that defendant's reasons for not hiring her were pretexts for discrimination.

■ As an initial matter, defendant asserts that plaintiff has failed to preserve her claim that Godich's failure to hire her for the restructured KCDC position constitutes discrimination. According to defendant, the pretrial order asserts only that plaintiff's termination was discriminatory. The pretrial order states

Plaintiff asserts that she was discriminated against due to her race in violation of 42 U.S.C. § 2000 et seq. Plaintiff asserts that defendant's actions in terminating plaintiff's employment as the administrative assistant in the Distribution Center, and in failing to hire plaintiff for the administrative assistant position in the Mail center were retaliatory and motivated, at least in part, by plaintiff's race.

Pretrial Order (Doc. # 46) at 9. Although the pretrial order discusses the "termination" of plaintiff's employment, this claim implicitly covers both the decision to consolidate the two positions and the decision not to hire plaintiff for the new position. The pretrial order is sufficient to preserve plaintiff's claim.

To establish a prima facie case of race discrimination for failure to hire, plaintiff must show that (1) she belongs to a protected class; (2) she was qualified for the position; (3) despite being qualified, she

---

47. Plaintiff attempts to cast doubt on defendant's asserted reason for the RIF by arguing that Deluxe facilities in Kansas City historically had more than one administrative assistant. Plaintiff has offered no evidence that Deluxe facilities normally had two administrative assistants, however, and she admits that one person assumed all of the duties which she and Nail performed—with some of Gajewski's duties as well. Also, plaintiff cites no evidence that the workload required two administrative assistants. Plaintiff has therefore failed to create a genuine issue of material fact as to defendant's reason for combining the two administrative assistant positions.

was rejected; and (4) after her rejection, the position remained open and the employer continued to seek applicants from people with plaintiff's qualifications or a non-minority was hired. See *Amro v. Boeing Co.*, 232 F.3d 790, 797 (10th Cir.2000) (applying factors in failure to promote context). Plaintiff contends that she has established her prima facie case because she is a minority, she had previously performed the work and was selected for a screening interview, she did not receive the position, and a non-minority with similar qualifications received the position.[48]

Defendant argues that plaintiff cannot establish that she was qualified for the restructured position because Hicks found that she lacked computer and initiative/follow up skills. Plaintiff admits that intermediate computer skills and initiative/follow up were listed as required skills on the final decision-making worksheet; that she made numerous errors on the Excel simulation; that Hicks determined that she did not demonstrate intermediate computer skills or initiative/follow up skills; and that Gajewski also considered her lacking in those areas. Plaintiff does not deny that she lacks intermediate computer skills and, although she asserts that determining whether someone has initiative/follow up skills is a subjective determination, she does not assert that she has those skills either. Plaintiff does not cite any evidence which controverts defendant's position that Duffin, who was selected for the job, did have the required skills for the position.

The crux of plaintiff's first argument is that the skills listed on the decision-making worksheet were not in the job description and were not really required for the job, and that she was qualified to perform the skills that the job did require. The Court notes that "[t]he relevant inquiry at the prima facie stage is not whether an employee or potential employee is able to meet all the objective criteria adopted by the employer, but whether the employee has introduced some evidence that she possesses the objective qualifications necessary to perform the job sought." *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir.2000). To support her contention that she was qualified for the position, plaintiff points out that she was already performing a similar job, that she had received a satisfactory 90–day performance evaluation in that job and that Godich had not noticed any deficiencies in her work. Although defendant presents evidence that the new position required knowledge of a different software application and that it combined the work of two administrative assistants (and some of Gajewski's tasks), the Court assumes without deciding that plaintiff has met her prima facie burden of presenting some evidence that she could have performed the restructured position.

 Deluxe states that it did not hire plaintiff for the restructured position because she was not the most qualified person for the job. Plaintiff does not assert that Duffin was not qualified, or that she was more qualified than Duffin.[49] Instead, she cites five pieces of evidence regarding the procedure by which Deluxe selected Duffin, which allegedly show that defendant's reason is pretextual.

First, plaintiff contends that Deluxe acted contrary to written policies by (1) hav-

---

**48.** Plaintiff need not prove that a non-minority was hired to establish her prima facie case, see *Amro*, 232 F.3d at 796, but plaintiff does present that evidence in this case.

**49.** Furthermore, plaintiff does not contend that she had the initiative/follow up and computer skills that Duffin demonstrated. Implicitly plaintiff concedes that she was not even as qualified as Duffin for the restructured position.

ing Hicks (who was not a representative of HR) conduct internal screening interviews, and (2) listing required skills on the final decision-making worksheet that were not in the job description or the initial draft of the decision-making worksheet. Plaintiff does not contend that Deluxe policies prohibited Hicks from conducting external interviews but she asserts that Brown or Rome should have done internal interviews. Defendant responds that to use either Brown or Rome would have departed from Deluxe policy because the internal job posting policy defines a Human Resources representative as someone who is responsible for the business area and activity at issue. Only Merget met this definition; Brown and Rome were responsible for other business areas. Although plaintiff has filed a surreply which responds to defendant's arguments, she does not deny that only Merget met the qualifications delineated in the written policy and that Merget was unavailable to conduct the internal screening interviews. Plaintiff also does not deny that Hicks (who had previously worked in HR) had experience in conducting screening interviews and that (as a current administrative assistant) she knew the qualifications necessary to succeed in that position. Defendant also points out that if Deluxe engaged in any alleged irregularity in having Hicks conduct the internal screening interviews, that irregularity disadvantaged plaintiff and Nail equally.[50]

Plaintiff also contends that Deluxe violated written policies by including required skills on the final decision-making worksheet that were not on the job description or the initial draft of the decision-making worksheet. Plaintiff does not dispute, however, that the job description required "good understanding of spreadsheet and word processing software packages," Deluxe Job Description (Deposition Exhibit 69) in Plaintiff's Exhibits (Doc. # 52), and states that an administrative assistant should "[f]ollow up on tasks as requested by manager" and "[see] beyond the current problem or solution and [generate] new ideas or practices." Id. Plaintiff cites no policy which requires the final draft of a decision-making worksheet to mimic the first draft. In addition, she has cited no policy which requires a decision-making worksheet to mimic the job description, instead of using summary phrases. This alleged policy violation does not support an inference of pretext.

Second, plaintiff argues that Deluxe acted contrary to customary policies by (1) having Hicks conduct the screening interviews when Vega had received complaints of racism about her, and (2) using an unvalidated Excel simulation that did not bear a reasonable relationship to the duties of an administrative assistant. Plaintiff has submitted evidence that Vega and Rome considered it unusual for Hicks to conduct screening interviews and that Vega believed Hicks was racist. The Court has

50. Plaintiff contends that she was uniquely disadvantaged because Hicks had racial animus against African Americans, but she has submitted no evidence that Schwartz (who recommended Hicks), or Godich and Merget (who relied on Hicks), were aware of complaints of racism involving Hicks. Using a known racist to conduct screening interviews would perhaps violate company policy, but the record contains no evidence that anyone in the hiring process knew of Vega's belief that Hicks was racist. Furthermore, Vega's belief lacks proper evidentiary support in the record. Therefore this purported irregularity does not support an inference of discrimination. See Kendrick v. Penske Transp. Serv., Inc., 220 F.3d 1220, 1230 n. 9 (10th Cir.2000) (where alleged procedural irregularity disadvantaged all potential applicants, fact that company failed to follow own procedures does not suggest either that defendant's proffered reasons were pretextual or motivated by illegal discrimination) (citation omitted).

previously addressed the problems with plaintiff's argument that Hicks was racist, namely that she has proffered no evidence that Godich, Merget or even Schwartz was aware of Vega's belief. Regarding Vega and Rome's belief that it was unusual for Hicks to conduct a screening interview, the record contains no evidence that plaintiff was uniquely disadvantaged because someone outside of Human Resources screened internal applicants. Plaintiff admits that Deluxe has administered typing and 10 key tests to job applicants in the past; her issue with regard to the Excel simulation is apparently that it was not validated by Human Resources, and she claims that it bore no relationship to the job as Duffin performs it. Even if Deluxe veered from company policy in using an unvalidated test, however, plaintiff has not pointed to any part of the test that was biased or uniquely disadvantaged minority candidates. Also, Duffin testified that to complete her current work, she uses the manipulations that the Excel simulation required. Plaintiff has produced no evidence that the Excel simulation supports an inference of discrimination.

Third, plaintiff asserts that the requirement of intermediate computer skills and initiative/follow up evidences a procedural irregularity that supports an inference of pretext. Aside from her assertion that this requirement was a procedural irregularity, plaintiff produces no evidence that Hicks departed from Deluxe policy when she listed the required skills on the decision-making worksheet by use of summary phrases instead of narratives from the job description. The gist of plaintiff's argument is that she was uniquely disadvantaged by this requirement because according to her 90–day performance evaluation, she needed development in the areas of computer skills and initiative/follow up. The fact that plaintiff did not have the required skills, however, does not support an inference that Deluxe discriminated

against her in requiring those skills. Furthermore, plaintiff has produced no evidence that Hicks or Godich knew that plaintiff was weak in those areas when they developed the decision-making worksheet. Plaintiff's evidence does not support an inference of discrimination.

Fourth, plaintiff argues that Deluxe's use of a required skill which necessitated a subjective assessment (initiative/follow up) allows an inference of pretext. Plaintiff is correct that in failing to hire a minority, the use of subjective factors can support an inference of discrimination. See *Mohammed v. Callaway*, 698 F.2d 395, 401 (10th Cir.1983) (when minority is objectively better qualified than non-minority candidate, use of subjective factors may support inference of pretext when employer relies on such factors to reject minority candidate). This does not mean that the use of subjective factors constitutes per se discrimination. Such factors often play a legitimate role in the hiring process. See *Toney v. Cuomo*, 92 F.Supp.2d 1186, 1193 (D.Kan.2000). In this case, plaintiff's argument is unavailing because she was not objectively better qualified than the candidate ultimately chosen. Even if she had demonstrated initiative/follow up, she did not demonstrate intermediate computer skills. This does not support an inference of discrimination.

Finally, plaintiff argues that she was told on July 11, 2000 that her technical skills were not as strong as Duffin's, but Duffin was not interviewed until July 14, 2000. Plaintiff has produced no testimony, however, which supports her assertion that she was told on July 11, 2000 that she did not receive the position. Indeed plaintiff's own testimony contradicts the assertion she now attempts to make in her summary judgment response. Defendant is entitled to summary judgment on plaintiff's failure to hire claim for the restructured KCDC

position; plaintiff has not demonstrated a genuine issue of material fact with regard to the issue of pretext.

## C. Failure To Hire Plaintiff At The Mail Center

█ Plaintiff contends that Morales refused to hire her for the mail center position because of racial discrimination. Defendant argues that plaintiff has failed to exhaust administrative remedies for this claim. Plaintiff responds that she sent the EEOC a letter which mentioned her mail center claim and her claim therefore falls within the scope of an EEOC investigation that would grow out of her charge of discrimination.

Under Title VII, the Court only has subject matter jurisdiction over plaintiff's claims if she has exhausted her EEOC administrative remedies. See *Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 799 (10th Cir.1997). The purpose of the exhaustion requirement is to give the charged party notice of the alleged violation and give the agency the information it needs to investigate and resolve the dispute between the employee and the employer. See *id.*; see also *Khader v. Aspin*, 1 F.3d 968, 971 (10th Cir.1993). Plaintiff must have raised before the EEOC every issue she now brings, or any additional claims must be "reasonably related" to the claims that she did bring before the EEOC. See *Brown v. Hartshorne Pub. Sch. Dist. No. 1*, 864 F.2d 680, 682 (10th Cir.1988).

In this case, plaintiff's EEOC and KHRC charges did not raise the mail center claim; plaintiff raised it only in a letter which asked the EEOC to reconsider its determination not to prosecute her claim. This letter is inadmissible, however, because plaintiff failed to produce it during discovery.

Plaintiff's EEOC and KHRC charges are clearly insufficient to exhaust plaintiff's administrative remedies concerning her mail center claim. The Court may consider claims not expressly included in an EEOC charge only where the conduct alleged would fall within the scope of the EEOC investigation which reasonably would have grown out of the charge that plaintiff actually made. See *Martin v. State of Kansas*, 978 F.Supp. 992, 998 (D.Kan.1997) (quoting *Martin v. Nannie and the Newborns., Inc.*, 3 F.3d 1410, 1416 n. 7 (10th Cir.1993)). The EEOC charge and the judicial complaint must at least describe the same conduct and implicate the same individuals. See *id.*

Nothing in plaintiff's EEOC or KHRC charges implicate Morales or the mail center. Plaintiff applied for the mail center job on July 21, 2000 and learned later that month that she had not been selected. She signed her EEOC charge on August 28, 2000 and her KHRC charge in December 2000—long after she learned that she had not received the mail center position. In addition, plaintiff was represented by counsel when she filed her charges. Plaintiff has not cited admissible evidence that she exhausted her administrative remedies regarding the mail center position. Defendant is therefore entitled to summary judgment on this claim.

## II. Retaliation Claims (Count II)

Plaintiff claims that in retaliation for her call to the employee hotline, Godich made changes to the KCDC decision-making worksheet that negatively impacted her ability to get the administrative assistant position. Defendant argues that it is entitled to summary judgment because plaintiff cannot establish a causal connection between these activities.

In order to establish a prima facie case of retaliation, plaintiff must show that (1) she engaged in protected opposition to discrimination; (2) defendant subjected her to

adverse employment action; and (3) a causal connection exists between the adverse employment action and her protected activity. See *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir.1998). Once plaintiff sets forth her prima facie case, the burden of production shifts to defendant to produce a legitimate, nondiscriminatory reason for the adverse action. See *Rahn v. Junction City Foundry, Inc.*, 161 F.Supp.2d 1219, 1237 (D.Kan.2001). If evidence of a legitimate reason is produced, plaintiff may still prevail if she demonstrates that the articulated reason was a mere pretext for discrimination. See *id.*

■ For purposes of summary judgment, defendant concedes that plaintiff's call to the hotline constitutes protected opposition and that her failure to receive the KCDC position constitutes an adverse employment action. In its summary judgment motion, defendant argues that plaintiff cannot establish a prima facie case of retaliation because she has no evidence of a causal connection between the hotline call and Godich's decision to hire someone other than plaintiff for the restructured KCDC position.

■ As an initial matter, defendant again asserts that plaintiff has failed to preserve her retaliation claim with regard to the restructured KCDC position. Defendant contends that the pretrial order only asserts that Godich eliminated plaintiff's position, not that he failed to hire her for the new position. With regard to plaintiff's retaliation claim, the pretrial order states

> Plaintiff asserts that defendant retaliated against her in violation of 42 U.S.C. § 1981 because she called the hot line or about June 12, 2001. Plaintiff asserts that defendant's actions in terminating plaintiff's employment as the administrative assistant in the Distribution Center, and in failing to hire plaintiff for the

administrative assistant position in the Mail Center were retaliatory and motivated, at least in part, by plaintiff's call to the hot line.

Pretrial Order (Doc. # 46) at 9. Although the pretrial order discusses the "termination" of plaintiff's employment, it implicitly covers both the decision to restructure her position and to not hire her for the new position. The pretrial order is therefore sufficient to preserve plaintiff's claim.

Defendant next argues that plaintiff cannot show a causal connection between her hotline call and Godich's failure to hire her for the new position because the decision-making worksheet was finalized before anyone involved in its creation knew of the hotline call and Hicks (who did not know about the hotline call until this lawsuit) made the decision not to forward plaintiff's name as a final candidate. The uncontroverted evidence shows that Merget did not learn of plaintiff's hotline call until June 23, 2000, when she checked her email after returning to work from vacation, and that Godich did not learn of plaintiff's hotline call until June 24, 2000. Finally, the uncontroverted evidence also shows that Hicks— who made the decision to not select plaintiff as a final candidate and did not know of the hotline call until this lawsuit—contacted plaintiff for an initial interview on June 23, 2000.

Plaintiff's theory is that after Godich learned of plaintiff's hotline call, he contacted Hicks and manipulated the decision-making worksheet so that plaintiff would not score as well as other candidates. Plaintiff does not contend that Godich told Hicks of the hotline call or that Godich told Hicks not to select plaintiff as a final candidate. Therefore the issue is whether the decision-making worksheet was completed before Godich learned of plaintiff's hotline call.

Plaintiff contends that Hicks could have finalized the decision-making worksheet on June 24, 2000–after Godich learned of the hotline call. Godich, however, swore that he did not know about plaintiff's hotline call when he spoke with Hicks about the screening interviews and decision-making worksheets. Hicks swore that she had completed all modifications to the decision-making worksheet before she set up plaintiff's interview on June 23, 2000. Plaintiff has cited no evidence to the contrary. She argues that the Court should disregard Hicks' sworn declaration because it is inconsistent with previous deposition testimony that Hicks did not recall the process by which she made the final modifications to the decision-making worksheet. Hicks' testimony, however, is not inconsistent with her declaration regarding the timing of the final modifications. Plaintiff presents no testimony which is remotely equivocal on the issue of timing. Based on the uncontroverted testimony, plaintiff's hotline call did not cause any modifications to the decision-making worksheet. Because a genuine issue of material fact does not remain on this point, defendant is entitled to summary judgment as to plaintiff's claim that Godich retaliated against her by not hiring her for the restructured KCDC position.

**IT IS THEREFORE ORDERED** that Defendants' Motion For Summary Judgment (Doc. # 47) filed January 15, 2002 be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion For Leave To File A Supplemental Memorandum In Opposition To Defendant's Motion For Summary Judgment (Doc. # 56) filed March 19, 2002 be and hereby is **SUSTAINED.**